HARTFORD NATIONAL BANK AND TRUST COMPANY *vs.*
UNITED TRUCK LEASING CORPORATION; ABRAHMS AGENCY,
INC., & another,[1] third-party defendants.

Norfolk. April 23, 1987. — August 21, 1987.

Present: GREANEY, C.J., CUTTER, & KASS, JJ.

*Insurance,* Broker, Motor vehicle insurance, Binder. *Contract,* Insurance,
Binder. *Bank. Uniform Commercial Code,* Holder in due course. *Practice, Civil,* Findings by judge, Appeal, Admissions, Amendment, Counterclaim and cross-claim, Complaint, New trial, Counsel fees, Costs.
*Consumer Protection Act,* Businessman's claim, Unfair act or practice.
*Evidence,* Deposition.

Denial of an insured's motion to amend its third-party complaint against
its insurer was warranted where, contrary to the insured's claim, the
terms of a temporary insurance binder did not set the final premium for
a certain year but allowed the insurer to adjust the premium upward if
and when the actual insurance policy issued. [629-630]

In an action involving a commercial insurance transaction in which the
insured claimed that its insurance broker had not exercised reasonable
skill and diligence in searching the market on its behalf, the trial judge
was warranted in concluding that the broker had performed adequately
where the broker had explored over a two-month period fifteen alternative
sources of insurance for the insured's high risk business. [630-631]

An insurance broker, who used a premium financing form prepared and
printed by a certain bank, did not thereby become the bank's agent so
as to defeat an action by the bank, as a holder in due course of the
financing instruments, against the insured. [631-632]

The record of a civil action demonstrated that the judge's findings were
sufficient to support his conclusions and were reached independently.
[632]

Where the trial judge hearing a civil action involving a commercial insurance contract found no misrepresentation or coercion in the sale of
the policy, he properly concluded there was no basis for claims under
G. L. c. 93A against the insurance company and the broker. [632]

No reversible error appeared in the admission of depositions at a civil
jury-waived trial. [632-633]

[1] Aetna Casualty and Surety Company.

Posttrial motions to amend a counterclaim under Mass.R.Civ.P. 15(b) and
for a new trial were properly denied [633], and a determination of the
attorneys' fees to be awarded to the prevailing party was appropriate
[633-634].

CIVIL ACTION commenced in the Superior Court Department
on February 4, 1980.

The case was heard by *George W. Cashman,* J., sitting
under statutory authority, and postjudgment motions by the
defendant United Truck Leasing Corporation for a new trial
and to amend its counterclaim and its third-party complaint
were heard by *Ernest S. Hayeck,* J., sitting under statutory
authority.

*Harold Meizler* (*Saul L. Benowitz* with him) for United
Truck Leasing Corporation.

*Michael G. West* for Hartford National Bank and Trust Company & others.

KASS, J. In a purely technical sense this is an action on a
promissory note, but the underlying quarrel concerns the right
of an insurer to increase the premium charged for a binder and
the obligations of an insurance broker to its customer. We
sketch the pertinent facts, drawn from findings made by the
trial judge, who sat without a jury, and fleshed out from the
record before us.

United Truck Leasing Corporation (United), which operates
out of Braintree, in 1979 had approximately 500 to 600[2] trucks
under lease and on the road. Lessees insured about 300 or 400
of the trucks and United bought insurance for approximately
200 trucks. From 1970 to 1979, United insured with Aetna
Casualty & Surety Company (Aetna) through a broker in West
Hartford, Connecticut, Abrahms Agency, Inc. (the broker).
Each January, Aetna issued a written binder with a provisional
premium, i.e., the premium was subject to revision, the direction
of which was always up. For 1979, United received the
customary binder early in January of that year. The document
bore the title "Premium Bearing Binder" and called for an

---

[2] This considerable spread in the number of trucks which United owned
in the year in question is what United's president said in his testimony.

"advance provisional premium" of $150,000. The document provided: "The premium for this binder will be credited against the deposit or Advance Policy Premium. If the premium for the policy exceeds the premium paid for this Binder the Named Insured shall pay the excess to the Company; if less the Company shall return the overpayment to such Named Insured."

Insurance matters were handled for United by Theresa Pelletier, its comptroller, officer manager, and a stockholder. She understood that the advance provisional premium stated in the binder was invariably adjusted upward in the light of more complete data, such as the size of the fleet and the approval of new rates by the Massachusetts Commissioner of Insurance. On January 30, 1979, United received and signed a "Premium Finance Agreement" under which it agreed to pay the $150,000 premium, plus finance charges of $7,313. That paper, prepared by Hartford National Bank and Trust Company (the bank), referred to the broker as the original creditor but was by its terms assigned to the bank and contained a promise of United to pay the indebtedness to the bank in ten equal installments of $15,731.31.[3]

Upward adjustment euphemistically describes the 1979 premium ultimately charged by Aetna to United: $340,501.[4] Those ill tidings the broker passed on to United at a meeting with Pelletier and United's president on May 23, 1979. It was not the only bad news. In view of insurance losses in 1979 arising out of its coverage of United, Aetna had notified the broker that it would not renew United's coverage in 1980. The broker was made aware of this unwelcome information in March but delayed facing the music with its customer until May 23d. During the interim the broker attempted to obtain insurance from some fifteen sources with which it had agency or brokerage arrangements. The broker did not try to place the insurance with a company that dealt directly with the customer and did

---

[3] As to insurance premium financing generally, see G. L. c. 255C. See also *Allston Fin. Co.* v. *Hanover Ins. Co.*, 18 Mass. App. Ct. 96, 97-99 (1984).

[4] Apparently there were some modifications in the coverage, because the premium eventually financed came to $322,951.

24 Mass. App. Ct. 626 629

Hartford National Bank & Trust Co. *v.* United Truck Leasing Corp.; Abrahms Agency, Inc.

not pay commissions, nor did the broker suggest any source with which United might deal directly.

What was to be done? The broker was able only to suggest paying Aetna's additional premium through execution of a supplementary premium finance agreement. If the full premium was not paid, Aetna would cancel the policy and United's uninsured vehicles would have to be off the road — an unpalatable prospect. United consulted with another insurance broker, Alexander & Alexander; it also consulted with its lawyer. The upshot was that United signed the additional premium finance agreement, as of May 23, 1979, promising to pay $181,383.05 in ten equal installments of $18,138.30. That is the second instrument upon which the Bank has sued.

By reason of the various counts in the main case, the counterclaims and the third-party action, twelve separate judgments were entered. The result was to require United to pay the bank $105,974.23, plus interest, on account of United's unpaid debt to the bank and $38,313.15 on account of the bank's legal fees, which paragraph 11 of the premium finance agreements hung on United as the purchaser of the insurance. United's various counterclaims and its third-party complaint were dismissed. Motions by United for a new trial and to amend pleadings to conform to the evidence were denied after hearing.

1. *How binding the binder?* United argues on appeal that Aetna was bound to insure United's truck fleet for a $150,000 premium, subject to adjustment only for facts not available to Aetna when the binder was prepared.[5] United was not an unsophisticated buyer of insurance. Apart from being represented by a broker, its comptroller and office manager, Pelletier, was experienced in buying insurance. United, therefore, was aware that "rates chargeable for motor vehicle policies in Massachusetts are subject to the vicissitudes of legislative and administrative regulation." *Allston Fin. Co.* v. *Hanover Ins.*

[5] There is some doubt whether the question is properly before us. It was first raised in a posttrial motion to amend United's third-party complaint against Aetna, a motion which was denied. The motion, as set forth later in this opinion, could have been denied as matter of discretion, or on the ground that the facts did not warrant allowance of the motion. Against the possibility that it was the latter, we consider the issue.

*Co.,* 18 Mass. App. Ct. 96, 98 (1984).[6] The *Allston Finance* case spoke to the duty of an insurance agent "to state the premium accurately within the limits of knowledge then available," *ibid.*, and a similar duty, probably, rests with the insurer.

In *Allston Finance,* however, an actual insurance policy had issued. Here only a binder had issued and the binder expressly spoke of a *provisional* premium and the expectation that the policy would call for a different premium. The binder contract, a commercial document, is to be read in accordance with its terms and not in accordance with unexpressed terms which a party later wishes had been written into it. The purpose of a binder is to provide temporary insurance. 2 Couch, Insurance § 14.26 (2d ed. 1984). Aetna, under the binder, was liable, in consideration of the provisional premium, to insure United until Aetna issued a policy or refused coverage. It was not bound to what, by express terms and several years of usage with this customer, was a provisional premium. There was no evidence that Aetna took a particularly long time in determining its final premium or that it calculated that premium by other than standard criteria.[7]

2. *Whether the broker fulfilled its duty to its customer.* In two respects, United claims, the broker did not exercise the reasonable skill and ordinary diligence which a customer may expect from an insurance broker. See *Bicknell, Inc.* v. *Havlin,* 9 Mass. App. Ct. 497, 500 (1980); 3 Anderson Couch's Cyclopedia of Insurance § 25.37 (2d ed. 1984).[8] First, United

---

[6] In an action on an insurance contract, it is appropriate to apply the law of the state where the insured risk is principally located. Restatement (Second) of Conflict of Laws § 193 (1971).

[7] The final premium for 1978 had risen to $144,187 from a provisional premium of $88,124.

[8] The broker, it will be recalled, did business in Connecticut, although the customer's place of business was in Braintree, and Massachusetts law controlled the policies. Under the significant relationship tests, see Restatement (Second) of Conflict of Laws §§ 6 and 291 (1971), Massachusetts law appears to apply. See also *Bushkin Associates, Inc.* v. *Raytheon Co.,* 393 Mass. 622, 634 (1985). The choice of law is not a weighty issue because Connecticut law is consistent with that expressed in the *Bicknell* case. See *Ursini* v. *Goldman,* 118 Conn. 554 (1934); *Lewis* v. *Michigan Mill-*

24 Mass. App. Ct. 626 631

Hartford National Bank & Trust Co. v. United Truck Leasing Corp.; Abrahms Agency, Inc.

says, the broker failed to shop the market exhaustively enough; second, it delayed too long in informing United that Aetna would not provide insurance for 1980. The efforts by the broker to place United's insurance with fifteen other potential insurers in a tight market (leased vehicles were regarded as a high risk by the insurance industry) warranted the trial judge's conclusion that the broker had adequately explored alternative sources of insurance. The duty of making a diligent market search may be fulfilled if the agent tries to place the risk with one of the insurers for which the agent customarily acts. *Rayden Engr. Corp.* v. *Church,* 337 Mass. 652, 663 (1958). See also *Beacon Indus., Inc.* v. *Walter Kaye Associates,* 789 F.2d 172, 174 (2d Cir. 1986).

Especially in view of Pelletier's relatively sophisticated knowledge of the insurance market, the broker was not obliged to advise United from what sources United might buy insurance directly, i.e., without intervention of a broker. See *Rayden Engr. Corp., supra* at 663. Significantly, on its own initiative, United consulted with another broker, Alexander & Alexander, about alternatives to insuring with Aetna in 1979. One may infer from United's decision to pay Aetna's premium for 1979 that alternative sources of insurance were hard to come by.

As to the two-month delay (while the broker explored the market) in notifying United of Aetna's refusal to insure in 1980, it is sufficient to observe that no damage flowed from the delay. United obtained insurance from a direct source and, it appears, for a price lower than Aetna's.

3. *The bank's status as a holder in due course.* There is nothing to the argument that, merely because the broker used a premium financing form prepared and printed by the bank, the broker thereby became the bank's agent. The broker did not discuss premiums or any details of the transaction with the bank. Manifestly, the bank was acting as a money source — as banks do. It took the premium financing instruments for value, in good faith, and without notice of any defense; it was

---

*ers Mut. Ins. Co.,* 154 Conn. 660 (1967); *Todd* v. *Malafronte,* 3 Conn. App. 16 (1984); *Beacon Indus., Inc.* v. *Walter Kaye Associates, Inc.,* 789 F.2d 172, 174 (2d Cir. 1986).

a holder in due course. See §§ 3-302 through 3-305 of the Uniform Commercial Code, as appearing in Conn. Gen. Stat. §§ 42a-3-302 through 305 (1981); *Waterbury Sav. Bank* v. *Jaroszewski,* 4 Conn. Cir. 620, 623-624 (1967).

4. *The trial judge's findings.* The findings are not a model of logical order, clarity, or detail. Wholesale reference by number to answers by Aetna and the broker to requests for admissions require much flipping back and forth in the record. When that exercise is completed, however, we are satisfied that the judge dealt with the pertinent issues and that the parties are informed about the basis for his decision. See *Schrottman* v. *Barnicle,* 386 Mass. 627, 638-639 (1982); *Markell* v. *Sidney B. Pfeifer Foundation, Inc.,* 9 Mass. App. Ct. 412, 416 (1980); *Acme Plastering Co.* v. *Boston Housing Authy.,* 21 Mass. App. Ct. 669, 671 (1986). There is no merit whatever to the assertion that the judge's findings slavishly adopted rulings and findings proposed by the parties, see *Cormier* v. *Carty,* 381 Mass. 234, 236-238 (1980), for the reason, if no other, that no proposals of the prevailing parties appear in the record. The judge's memorandum of decision reflects personal analysis. United can scarcely complain about the judge's adoption of factual admissions which United furnished to him.

5. *Chapter 93A claims.* The judge found that Aetna did not misrepresent what the premium would be and that when it had the underlying data, timely informed United about the revised premium. He found that United was aware that there would be fluctuations, even if the extent of the premium increases came as a surprise. He found that the broker did not, by telling United there was no alternative known to the broker, coerce United, a seasoned, knowledgeable commercial purchaser of insurance, into signing the supplementary premium finance agreement. Having failed to make out a case on these grounds, United could not claim that Aetna or the broker had acted unfairly or deceptively. See *PMP Associates, Inc.* v. *Globe Newspaper Co.,* 366 Mass. 593, 596 (1975); *Levings* v. *Forbes & Wallace, Inc.,* 8 Mass. App. Ct. 498, 504 (1979).

6. *Admission of depositions.* United objected generally at trial to the admission of four depositions and accompanying

exhibits. On appeal United protests that the trial judge never ruled on those objections. The record reads otherwise, namely, that the judge overruled the objections. To the extent the judge may have been understood as leaving open certain specific objections, United never made any such objections. In its brief on appeal, United does not say what in the depositions was inadmissible and how it was harmed by the admission of the depositions. There was no reversible error.

7. *Posttrial motions.* The trial judge died some time after hearing United's motions to amend its counterclaim and its third-party complaint and for a new trial. Those motions were heard again by a second judge and denied. The proposed amendments sought to add counts for breach of contract and unfair and deceptive practices. Prescinding from questions of timeliness, see *Hall* v. *Horizon House Microwave, Inc., ante,* 84, 88 (1987), those claims, as we have seen, were without merit. There is no call upon a trial judge to allow, under Mass. R.Civ.P. 15(b), 365 Mass. 761 (1974), a party to add to the pleadings a claim without legal merit. See *Liberty Leather Corp.* v. *Callum,* 653 F.2d 694, 700 (1st Cir. 1981). As for the motion for a new trial, United urges no ground that has not already been disposed of, adversely to it, in this opinion.

8. *Legal fees.* Under the premium finance agreements, the bank is entitled to the reasonable legal fees and costs incident to collection. The second judge, after hearing, awarded $38,315.50. United does not challenge the time spent by the bank's lawyer or the reasonableness of his time charges. It argues, rather, that counsel for the bank, who also represented Aetna and the broker, has heaped all his services together and, therefore, United is being asked to pay for Aetna's and the broker's defense. The difficulty with United's position is that, by its counterclaims against the bank and its contention that the bank was not a holder in due course, it forced the bank to analyze and rebut the claims against Aetna and the broker. It will be recalled that United charged the bank with being the broker's principal. It also charged the bank with having — through the broker — coerced United into signing the premium finance agreements and having engaged in unfair and deceptive

practices. In the circumstances, we think the second judge could, as he did, conclude that the exertions of the bank's counsel would not have been materially different even if the third-party complaints had not been brought by United against the broker and Aetna.

The judgments are affirmed. Counsel for the bank requested leave to file an affidavit in support of additional legal fees arising out of this appeal. Such an affidavit may be filed with the court within thirty days of the issuance of the rescript in this case.

*So ordered.*