**In re WASTE SYSTEMS INTERNATIONAL, INC., et al., Debtors.**

**Nos. 01–0099 (CGC) to 01–0129 (CGC).**

United States Bankruptcy Court,
D. Delaware.

Dec. 9, 2004.

---

Scott D. Cousins, Victoria Watson Counihan, Greenberg Traurig, LLP, Wilmington, DE, Annapoorni R. Sankaran, Greenberg Traurig, LLP, Daniel C. Cohn, A. Davis Whitesell, Cohn & Whitesell LLP, Boston, MA, for Waste Systems International, Inc., et al., Debtors.

Karen Lee Turner, Ronald S. Gellert, Eckert, Seamans, Cherin & Mellott, LLC, Wilmington, DE, Heather E. Rennie, Eckert, Seamans, Cherin & Mellott, LLC, Philadelphia, PA, for Claimant, Zurich American Insurance Company.

## MEMORANDUM OPINION

CHARLES G. CASE, II, Bankruptcy Judge.

At issue are the Proofs of Claim, Nos. 596 & 709, of Zurich American Insurance Company ("Zurich" or "Claimant") against Debtor Waste Systems International, Inc., and its subsidiaries [1] (collectively referred to as "Debtors" or "WSI") for amounts allegedly owed Zurich in liability deductibles on a business automobile insurance policy issued to WSI (the "Policy"). Upon consideration of all relevant pleadings, the evidence presented a trial, the parties post trial briefs, and for the reasons set forth, the Court finds that Debtor was bound by a $5,000 liability deductible for the period of October 26, 1998, to February 15, 2000.

## BACKGROUND AND FACTS

For the most part, the following facts are undisputed.

WSI was in the business of hauling solid waste with its primary operations in Massachusetts. From August 1, 1998, Willis of Massachusetts, Inc., f/k/a Willis Corroon Corporation of Massachusetts ("Willis") has been WSI's insurance broker and, for the time periods relevant to the dispute here, Peter Russell ("Mr.Russell") was the producer at Willis working on WSI's account.

Prior to October 26, 1998, Zurich insured Debtor under an insurance policy that did not contain a liability deductible for bodily injury and property damage (the "Prior Policy"). (Trial Exhibit 1). In the fall of 1998, WSI acquired a facility known as Horvath Sanitation ("Horvath") in Pennsylvania. Horvath's insurance policy ("the Horvath Policy") at the time of the acquisition similarly did not contain a liability deductible. However, the Horvath Policy had a lower premium through a different insurance company than the policy Debtor had through Zurich. In an effort to garner some competitive pricing, WSI's Risk Manager gave a copy of the Horvath policy to Mr. Russell at Willis, who then transmitted it to Pamela Howell ("Ms.Howell") at Zurich, asking whether

---

1. WSI's wholly owned subsidiaries include: WSI Medical Waste Systems, Inc.; WSI New York Holdings, Inc.; WSI of New York, Inc.; WSI Camden Transfer Station, Inc.; Palmer Resource Recovery Corporation; WSI Vermont Holdings, Inc.; WSI Moretown Landfill, Inc.; WSI of Vermont, Inc.; WSI Burlington Transfer Station, Inc.; WSI St. Johnsbury Transfer Station, Inc.; WSI Waitsfield Transfer Station, Inc.; WSI Massachusetts Holdings, Inc.; Waste Systems International of Massachusetts Hauling, Inc.; Waste Systems International of South Hadley Landfill, Inc.; Waste Systems International Oxford Transfer Station, Inc.; Waste Systems International Massachusetts Recycling, Inc.; Waste Systems International Lynn Transfer Station, Inc.; Spartan Consolidated, Inc.; Sterling Packaging, Inc.; WSI Pennsylvania Holdings, Inc.; WSI Sandy Run Landfill, Inc.; WSI Altoona Hauling, Inc.; Mostoller Landfill, Inc.; WSI Somerset Hauling, Inc.; Community Refuse Service, Inc.; WSI Harrisburg Hauling, Inc.; WSI Mifflin County Landfill, Inc.; WSI Maryland Holdings, Inc.; Eastern Trans–Waste of Maryland, Inc.; and WSI Maryland Hauling, Inc.

Zurich could offer comparable rates. No discussion was had regarding whether the comparable quote should include a liability deductible.

Ms. Howell consulted with David Jung ("Mr. Jung") at Zurich and, by letter dated August 13, 1998, requested what she called "basic information" from Mr. Russell about WSI's "losses for the last two years, driver's lists, and effective dates" in order to provide a quote. Although this information was not provided, Ms. Howell transmitted to Mr. Russell via facsimile a proposal of insurance for a business policy referred to as "Revision # 2." The proposal included a five thousand dollar liability deductible. Ms. Howell made another request for, *inter alia,* the above referenced information on October 21, 1998. That same day, she sent another insurance proposal referred to as "Revision # 3," again including a five thousand dollar liability deductible.

By facsimile dated October 26, 1998, Russell requested that Zurich bind Auto Liability and Physical Damage Coverage with terms and conditions consistent with the Quotation with three exceptions, none of which made any change to the liability deductible in either Revision # 2 or Revision # 3. The exceptions stated that WSI would not provide the requested information and that the commission to be paid to Willis would be fifteen per cent. That same day, Ms. Howell transmitted a binder of insurance (the "Binder") to Willis: The Binder included the five thousand dollar liability deductible that had been listed in the earlier Quotations. Zurich sent a second copy of the Binder to Mary Ellen Alessi ("Ms. Alessi"), another account representative at Willis, on November 23, 1998. Mr. Russell does not recall whether he sent a copy of the Binder to Debtor after receipt, as was his usual practice.

On September 23, 1999, approximately eleven months after the Binder was issued, Mr. Russell, Stephen Garcelon ("Mr. Garcelon"), WSI's risk manager, Ms. Alessi, Eileen Leonard ("Leonard") and Georges Pigualt ("Pigualt"), both Zurich underwriters, met to discuss Debtor WSI's coverage. At the meeting, Mr. Leonard indicated that the insurance policy contained a liability deductible. This was apparently the first time Mr. Russell learned that the Binder contained a liability deductible, and both he and Mr. Garcelon believed that no liability deductible had been agreed to by Mr. Willis or WSI. According to Mr. Russell and Mr. Garcelon, the issue was not resolved when the meeting adjourned.

After the meeting, Ms. Alessi sent an email to Mr. Garcelon, with carbon copy to Mr. Pigault, itemizing the issues allegedly discussed during the September 23, 1999, meeting, including "Waiving the Bodily Injury & Property Damages Deductible charges." Mr. Garcelon received the email, but the message to Mr. Pigualt was never received due to an incorrect email address. No evidence shows Zurich ever received a copy of the email.

By letter dated October 8, 1999, Zurich finally transmitted to Mr. Russell the WSI business automobile insurance policy. This delay in time between issuance of the Binder and the actual Policy was not, in and of itself, unusual due to the backlog at Zurich in issuing policies once coverage was bound. Unlike the Binder, the Policy did not contain a liability deductible endorsement. The cover letter accompanying the Policy requested Mr. Russell "review for coverage as agreed to and advise in writing of any discrepancies." Mr. Willis never responded. Ten days later, on October 18, 1999, Ms. Leonard sent an email to Mr. Garcelon and Ms. Alessi regarding the availability of a loss run report for the outstanding, and apparently still

disputed, liability deductibles on the insurance policy.

Once Zurich discovered that the issued Policy lacked a liability deductible, Ms. Leonard sent Ms. Vacca, a Willis account manager, a Liability Deductible Endorsement changing the Policy to include the liability deductible. Ms. Vacca sent a responsive letter to Ms. Leonard returning the endorsement and stating that "Per Peter Russell's *many* conversations with David Young [sic]; the enclosed endorsement was *never* requested to be issued in the above referenced policy. I am therefore returning endorsement CA 03 02 1293." Ms. Leonard in turn forwarded a copy of Ms. Vacca's response to Mr. Garcelon, along with a copy of the original October 28, 1998, quote letter and renewal binder indicating that the $5,000 liability deductible was "negotiated and bound for this policy."

On April 25, 2000, Zurich, through Ms. Leonard, transmitted for the first time to Mr. Garcelon at WSI invoices for the liability deductible. The next day Mr. Garcelon transmitted the invoices to Willis, stating that "[i]t continues to be our position that WSI never received any policy or endorsement notification regarding a Business Automobile Policy deductible from either Willis or Zurich, prior to 2/15/00." Ms. Vacca at Willis, in turn, then returned the invoices to Ms. Leonard at Zurich on May 3, 2000 stating, "our position remains the same as it has always been. That is, that no auto liability deductible was ever agreed to for policy (BAP) 355167100. Thus this money is not owed by WSI."

On January 11, 2001, WSI filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code. Zurich filed several Proofs of Claim, but the parties agree that only Proofs of Claim Nos. 596 and 709 are before this Court now. The total amount outstanding attributable to the disputed Liability Deductible on the insurance policy is $317,405 and the parties agree the claim, if valid, is unsecured. A trial was held on June 24, 2004.

## DISCUSSION

### I. *Introduction*

At bottom, the issue is whether Debtor was bound to a $5,000 liability deductible for the period of October 26, 1998, to February 15, 2000.

Debtor's position is that the issued Policy does not contain a $5,000 liability deductible and that, in attempting to procure insurance from Zurich, it never indicated to Willis or Zurich, through its agent Willis, that a liability deductible would be acceptable. In fact, Debtor never even discussed a deductible and one was not present in the Horvath Policy sent to Zurich for comparison bidding purposes. Additionally, Debtor argues that Zurich never indicated that it could not quote coverage without a liability deductible unless Debtor provided such information as loss runs and drivers lists.

Zurich's position is that it bound coverage for the business auto policy with a $5,000 liability deductible, as evidenced by each of the quotes and the Binder issued to Debtor's broker. The omission of the deductible in the subsequently issued Policy was, according to Zurich, simply an inadvertent error and, at no time during negotiations, did Willis or Debtor indicate it was not agreeing to the deductible provided in the quotes and Binder.

### II. *Massachusetts Law*

The parties agree that Massachusetts law applies here where Debtor's main operations and a majority of the vehicles insured were registered in Massachusetts. *In re Mariner Health Group,* 300 B.R. 610, 613 (Bankr.D.Del.2003) (Delaware

choice of law provides that "questions of rights and validity of insurance contracts are determined by the local law of the state which the parties understood was the principal location of the insured risk during the term of the policy, unless some other state has a more significant relationship under the principles stated in Section 6. Rest. (Second) of Conflicts of Law SS 193 (2003).").

■ The parties also agree that, under Massachusetts law, an insurance broker is the agent of the insured. *See Campione v. Wilson,* 422 Mass. 185, 195, 661 N.E.2d 658 (Mass.1996); *Hudson v. Massachusetts Property Ins. Underwriting Ass'n,* 386 Mass. 450, 455, 436 N.E.2d 155 (1982). Unless the insured expressly limits the broker's authority, the broker is authorized to negotiate any standard policy terms on behalf of the insured. *R–1 Assocs. v. Goldberg–Zoino & Assoc.,* 1995 WL 517554, *2, 1995 Mass.Super. Lexis 395, *4–6 (Mass.Super.1995) (citing Restatement (Second) of Agency, §§ 51).

### III. *The Binder*

We start first with the Binder, which clearly contained the $5,000 liability deductible. The question is whether the Binder bound Debtor to a $5,000 deductible where Debtor alleges that neither it nor its agent agreed to the deductible and where the subsequently issued Policy did not include the deductible.

■ An insurance company will generally issue a "binder," also called a temporary or preliminary insurance contract, that covers the applicant until the insurance company either issues a policy or refuses the risk. *See* Lee R. Russ & Thomas F. Segalla, 1 Couch on Insurance 3d § 13.1.; *Hartford Nat. Bank and Trust Co. v. United Truck Leasing Corp.,* 24 Mass.App.Ct. 626, 630, 511 N.E.2d 637, 640 (Mass.App.Ct.1987); *see also World Trade Ctr. Properties, L.L.C. v. Hartford Fire Ins. Co.,* 345 F.3d 154, 155 (2d Cir.2003). A binder is not an insurance policy, but it is considered a contract providing interim insurance from the date of the application until either completion or rejection of the principal policy. *See* 1 Couch on Insurance 3d § 13.2. An insurer is bound by the terms of the binder and it is "to be read in accordance with its terms and not in accordance with unexpressed terms which a party later wishes had been written into it." *Hartford Nat. Bank,* 511 N.E.2d at 640. As a general rule, ambiguities are to be construed in favor of the insured, but this only applies when there is in fact an ambiguity to be interpreted. *See* 1 Couch on Insurance 3d § 13.6. Clear terms should not be rewritten by a court. *Id.*

■ The Court finds no ambiguity in the Binder Zurich issued to Debtor: It clearly contained a $5,000 deductible. The Court is not persuaded differently by Debtor's argument that the Horvath Policy presented to Zurich for comparison did not contain any deductible and, therefore, the inclusion of the deductible in Zurich's Binder was improper or not binding. At no time before binding coverage did Mr. Russell or anyone else at Willis indicate that Debtor would not agree to a policy containing a liability deductible. The fact that the Horvath Policy did not contain one is insufficient to put Zurich on notice that a deductible was not a negotiable point. A comparison quote, against the Horvath Policy, is exactly that—a comparison quote. If the only way Zurich could beat the Horvath Policy's rate was by including a $5,000 deductible, then that is a variable Debtor would have to consider in determining which insurance company to engage.

■ Similarly, the Court finds unpersuasive Debtor's conclusory statement that

neither it nor its agent agreed to the deductible. By not refusing the deductible included in the quote and Binder, Mr. Russell in fact agreed to it. From the very beginning, Zurich quoted an insurance Policy and rate with a $5,000 liability deductible, starting with the simple, two page Automobile Quotation provided to Mr. Russell at Willis. In the quote, the deductible is listed on the front page as the second policy limit. It could not be clearer. It is not hidden. It is not ambiguous. Zurich sent Willis several copies of the quote—the first on October 19, 1998, and the second two days later. Five days later, Willis agreed to bind coverage and Zurich issued the Binder, again clearly containing a $5,000 liability deductible. A second copy of the Binder was forwarded to Willis on November 23, 1998.

Further, when Willis went to bind coverage based on the quote, Mr. Russell carefully negotiated changes to several of the quote's terms, none of which was the liability deductible. If Mr. Russell knew his client would not agree to the deductible, he should have similarly negotiated no deductible. The bottom line is that no one at Willis carefully reviewed the quote, a fact Mr. Russell admitted, testifying that he mistakenly agreed to bind coverage based on the quote because he did not pay attention to that portion of the quote.

He similarly did not carefully review the Binder, which was nearly identical in form and substance to the earlier quote but for the several changes Mr. Russell negotiated. Again, the deductible was clearly listed on the first page of the Binder. It was not hidden. It was not ambiguous. Mr. Russell overlooked it again. Mr. Russell is an experienced insurance broker. This is his business—reviewing quotes and binders.

Last, the Court rejects Debtor's argument that Zurich is at fault because it never told Debtor or Mr. Russell that it could not provide a quote or policy *sans* the $5,000 deductible if Debtor did not provide the information regarding its vehicles, loss history and drivers lists. This is simply an attempt to place blame on Zurich when it lies more properly with Debtor and its broker. From the record it appears Zurich made at least six attempts to get this information from Debtor and Mr. Russell, only to be met with complete silence. Debtor has provided no explanation for why it did not provide the requested information. The burden for this failure lies with Debtor and its agent.

Therefore, Debtor is bound by the $5,000 liability deductible in the Binder.

## IV. *The Policy*

The question then becomes: did the subsequently issued Policy without the deductible replace and override the terms of the Binder, thereby relieving Debtor from the deductible? And, if so, at what point was Debtor relieved of the deductible—for losses occurring during the period prior to issuance of the Policy or for losses only occurring during the period after the Policy issued?

"Generally a contract of temporary insurance [a binder] is terminated by the issuance, delivery, and acceptance of a policy, or by a rejection of the application, but if no policy is issued, delivered, and accepted, and the contract is not otherwise terminated, it continues until the time fixed for its termination or a reasonable time has expired." 1 Couch on Insurance 3d § 13.9. The binder "is merged in the terms and conditions of the written policy issued in accordance therewith. Therefore, terms not specified in the binder are, under ordinary circumstances, to be found in the policy, particularly where the application or binder incorporates such terms

by reference." *Id.* at § 13:8. Courts have routinely held, therefore, that in the case of conflict or ambiguity, the terms of the policy control. *See King v. Allstate Ins. Co.,* 906 F.2d 1537, 1541 (11th Cir.1990).

Unfortunately, this does little to answer the question here and the law upon which Debtor relies does little to help either. Here, the deductible was clearly provided in the Binder, suggesting that the subsequent silence in the Policy regarding a deductible means the deductible term from the Binder controls.

Debtor interprets the situation differently, indicating that the silence in the Policy in fact creates an ambiguity. In support of this position, Debtor cites to *Pine Ridge Realty, Inc. v. Massachusetts Bay Ins. Co.,* 752 A.2d 595 (Me.2000), which provides that "when the terms of the binder conflict with the terms of the standard policy, an ambiguity arises, and the binder and policy will be construed together with the most liberal provision in favor of the insured controlling." 752 A.2d at 599. *Pine Ridge* did not involve, however, a situation like here where the particular insurance provision at issue was in fact set forth in the original Binder and subsequently omitted from the Policy. The loss at issue in *Pine Ridge* was simply never contemplated.

In particular, the question in *Pine Ridge* was whether the insured was insured against flood losses, where such flood protection was never discussed with the insurance company, was not specifically included or enumerated in the binder, and the flood loss occurred before any policy issued. The court's analysis, therefore, focused on the language of the binder and the industry's and the insurance company's standard property insurance policies to determine whether such flood insurance was normally included in these type of situations. It concluded that without a specific request for flood insurance, the standard in the industry and with that particular insurance company was that the policy would not cover flood damage. Therefore, the apparent ambiguity in the binder—i.e., that the binder was silent as to whether flood loss was included—was resolved by relying on the standard industry policy that would have been issued eventually but for the dispute that arose between the parties.

By contrast, the Binder here is not ambiguous, so we need not look to the Policy to determine whether the deductible applied to losses occurring during the Binder period. The Binder clearly provided for the $5,000 deductible, such that for any losses occurring before issuance of the Policy, the $5,000 deductible would apply.

■■■ Even if we assume there was ambiguity as Debtor urges (based on the inconsistency between the Binder and the Policy), the extrinsic evidence establishes that the deductible should have properly been included in the Policy but for a mistake by Zurich. "Where ... policy terms are ambiguous and the coverage issue is reasonably disputed, a court may consider extrinsic evidence of the surrounding circumstances and the parties' intent." *Cohen v. Union Warren Sav. Bank,* 1991 WL 132421 (Mass.App.1991). The extrinsic, *undisputed* evidence shows that the deductible was included from the very beginning in the several quotes provided to Willis and in the ultimate Binder Mr. Russell agreed to on behalf of Debtor. Mr. Russell admitted that he is an experienced insurance broker and simply did not pay careful enough attention to any of these documents before binding coverage. The undisputed evidence also shows that neither Debtor nor Willis ever informed Zurich it would not agree to a deductible or ever asked Zurich to provide a policy quote or policy without a deductible.

The first indication of trouble in paradise did not occur until September 23, 1999, some 11 months after the Binder issued, when representatives of Willis, Debtor and Zurich met to discuss Debtor's insurance coverage. It was at this meeting that Mr. Russell and Debtor first "learned" of the deductible. When the meeting ended, all parties were under the impression that the liability deductible issue still needed to be resolved.[2]

Mr. Russell then received the actual Policy approximately two weeks later on October 8, 1999. The cover letter attached requested Mr. Russell to review the Policy and advise of any discrepancies. Mr. Russell never noted any, even though there was no liability deductible in the Policy and Mr. Russell admitted in his deposition that this issue had not been resolved since the September meeting. On October 18, Ms. Leonard at Zurich sent an email to Mr. Garcelon at Debtor and Ms. Alessi at Willis again asking for loss run reports for the outstanding liability deductibles on the Policy, indicating again that the issue of the deductibles was not resolved. Again, the information was never sent. Two months later, on December 7, 1999, Zurich forwarded a liability deductible endorsement to Ms. Vacca at Willis. Ms. Vacca returned the endorsements to Zurich two months later, on February 2, 2000, arguing that there was no liability deductible in the Policy.

Clearly, at the time the Policy was issued and for some time thereafter, the liability deductible was still at issue and the parties were still going back and forth about it, regardless of what the Policy provided. Debtor's argument that it believed the issue was resolved and that Zurich had agreed to waive the deductible when it issued the Policy without the deductible rings hollow. The evidence shows that there was no meeting of the minds with respect to the change contained in the Policy. In fact, Mr. Russell stated at his deposition that as of October, 1999 (when the Policy issued), the issue of the liability deductible had not been resolved. Further, he admitted that he did not "review the policy to determine whether there were any discrepancies of what was agreed to":

Q. Do you remember reviewing to see whether it had a liability deductible, reviewing the policy?

    *      *      *      *      *      *

A. No. I do not recall reviewing it for that purpose.

Debtor's attempt to capitalize on Zurich's error falls short in light of these facts and the fact that both Willis and Debtor continued in a series of negotiations and/or discussions with Zurich to resolve the issue after the Policy had issued. The Court rejects Debtor's plea to construe the ambiguity in its favor as the insured. Willis and its representatives are experienced insurance brokers knowledgeable in insurance negotiation and drafting. Debtor is a similarly sophisticated purchaser of insurance, such that the legal inclination to lean in favor of the uneducated or unsophisticated insured does not apply here. There is no need here to "equalize the disparate positions of the insured and insurer." *See Phoenix In-*

---

**2.** The Court agrees that the issue was not resolved at the meeting, despite the email from Ms. Alessi at Willis recapping the issues addressed at the meeting and including a single vague line saying, "Waiving the Bodily Injury & Property Damages Deductible charges." This line does little to persuade the Court that Zurich in fact agreed at that meeting to waive the deductible, especially in light of Mr. Russell and Mr. Garcelon's statements that they themselves believed the issue was not resolved. Zurich never received a copy of this email.

*demnity Ins. Co. v. Bell*, 896 P.2d 32, 35 (Utah Ct.App.1995).

Further, the Court finds persuasive Mr. Jung's testimony that Zurich could not in fact have issued this Policy without the deductible under state law. If it had done so, it would have been in violation of its filings and subject to fines by the State. No underwriter in Mr. Jung's unit had authority to issue the Policy without the deductible. In further support of Zurich's argument that the Policy initially issued was in error is Mr. Jung's testimony that, fortunately or unfortunately, Zurich issues a large number of policies and errors frequently occur in their drafting that must be remedied by a subsequent endorsement. As Mr. Jung stated, Zurich has

> approximately five hundred individual accounts that we wrote in our unit. Which means we were issuing more than one policy a day. We had had quite a bit of turnover with our administrative staff, and so we had a very large administrative backlog.... Unfortunately policies are issued with errors quite often. Probably more than we would like to admit. But, you know, as a matter of practice, we issue endorsements correcting those policies. Sometimes those policies are issued with coverages missing. But in good faith we issue endorsements to correct those policies to reflect the coverage that was bound in the agreement that was made at binding.

Debtor did not dispute this testimony.

Last, the Court does not see this as an issue of reformation. The question is really whether the Policy properly captured the terms of the Binder to which Debtor

had agreed. The approach in *Westchester Resco Co., L.P. v. New England Reinsurance Corp.*, 648 F.Supp. 842 (S.D.N.Y. 1986) *aff'd* 818 F.2d 2 (2d Cir.1987), is instructive. In *Westchester*, the binder issued provided for insurance coverage for the term of the construction project and three years thereafter. The policy subsequently issued was silent as to the three years of post-construction coverage. The court concluded that the term from the binder should be included within the policy and that the failure of the insurance company to include it was simply a mistake:

> Analytically, this problem can be approached in two ways, both of which yield the same result and give proper effect to the intent of the parties .... Under the first analysis the Binder and the Policy can be read together to form the insurance contract, and because the Policy is silent on the subject of completed operations, the provision in the Binder will control.... If the standardized terms of an unissued policy are to be read into the bargained terms of a binder, it seems appropriate to read the bargained terms of the binder into the standardized terms of the policy.

648 F.Supp. at 846.[3]

While the court in *Westchester* expressly found that the parties had clearly negotiated and agreed to the three years of post-construction coverage, that is really no different than what happened here. Debtor's argument to the contrary, as explained earlier, is simply against the weight of the evidence and ignores the fact that its broker agreed to the Binder clearly setting forth the deductible. The broker's unilat-

---

**3.** *Westchester* was cited with approval by the Second Circuit in *R.D. Management Corp. v. ACE Fire Underwriters Ins. Co.*, 2001 WL 300557 (2d Cir.2001), an unpublished case in which the court similarly agreed that where the insured agreed to a premium increase term in the binder, the failure to include the same term in the policy was simply an error: Where the insured did not object to the premium increase term in the binder, the terms of the binder were meant to carry over into the policy.

eral mistake is not enough to re-write the agreement.

### *CONCLUSION*

For the reasons set forth above, the Court finds that Debtor was bound by a $5,000 liability deductible from October 26, 1998, to February 15, 2000.

Zurich shall submit a proposed form of order under certification of counsel consistent with this decision.

So ordered.