Neel, Stephen E., J.
This action arises out of damage sustained by plaintiff Kopin Corporation’s (Kopin) property while in transit from the United States to Hong Kong. Kopin alleges claims against the defendants OneBeacon America Insurance Company (One-Beacon America), International Marine Underwriters (IMU) and The Northern Assurance Company of America (Northern) (collectively, the defendants or IMU) for declaratory judgment to determine the scope of the insurance policy issued to Kopin and the coverage owed under the policy (Count I); breach of contract (Count II); breach of the covenant of good faith and fair dealing (Count III); fraud (Count IV); negligent misrepresentation (CountV); and unfair and deceptive practices in violation of G.L.c. 93A (Count VI). Kopin now moves for partial summary judgment on Counts I, II, and VI. Defendants have cross-moved for summary judgment on all counts asserted against them. After hearing and consideration of the parties’ submissions, the plaintiffs motion will be allowed in part as to Counts I and II, and otherwise denied; the defendants’ motion will be denied.
BACKGROUND
The following facts are undisputed. Kopin is in the semiconductor business; it produces, among other things, light-emitting diodes (LEDs). Prior to the events leading up to the current dispute, Kopin imported new goods, including microscopes, photometers, and x-ray machines from overseas via both ship and aircraft. OneBeacon America and Northern are divisions of OneBeacon Insurance Company (OneB-eacon); IMU is the marine insurance division of One-Beacon. Through an independent insurance agency, GHM Agency Inc. (GHM), Kopin in 2004 bought an Ocean Marine Open Cargo Policy — No. CM JC50197— from IMU (the policy).[2] Although tailored to suit the needs of the insured, in general ocean marine open cargo insurance policies insure goods shipped by marine vessel (i.e. steamship or motorship), aircraft and connecting conveyances, and/or by UPS or other parcel service, from point of origin to final destination.
The policy, as issued in 2004, insured only new merchandise imported into the United States, whether shipped by air or by vessel. Specifically, the policy contains the following pertinent provisions:
Clause 5, “Goods Insured,’’ identifies insured goods as lawful new goods and /or merchandise consisting principally of microscopes, photometers, x-ray machines and other similar goods incidental to the business of the insured.
Clause 6, “Limit of Liability,” identifies IMU’s limits of liability according to the method of shipment. Thus coverage for cargo laden on deck was limited to $200,000; cargo shipped by aircraft or under deck in any vessel was limited to $2,000,000.
Clause 12, “Geographic Limits,” identifies the geographical limits of insured goods as import shipments only.
Clause 25, “Average Terms and Conditions,” identifies covered risks to goods shipped by marine vessel.
Clause 26, “Shipments by Aircraft,” identifies covered risks to goods shipped by aircraft.
Thus, by the plain terms of the policy as issued in 2004, all new, imported merchandise was insured up to $2,000,000, whether shipped by air or by vessel under deck.
The amount of coverage for insured goods is specified in Clause 13 (“Valuation Clause”): “The said goods and/or merchandise to be valued and insured as follows: . . . Valued at the amount of invoice including all charges therein, plus any prepaid and/or advanced and/or guaranteed freight not included in the invoice, plus 10%.”
Finally, although the parties refer to a “renewal quote” (see below), the policy itself provides for a continuous, indeterminate term. Clause 4, “Attachment,” states: “This policy shall attach and cover on all shipments made on and after 4/20/2004, commencing at 12:01 a.m. and continues until cancelled pursuant to the Cancellation Clause of this Policy.” The Cancellation Clause (Clause 67) provides: “This Policy to be deemed continuous and is to continue in force until cancelled by either party giving the other thirty (30) days written notice . . .”
Clause 63, “Payment of Premium,” does not indicate otherwise:
. . . this contract of insurance is intended to and does attach, in accordance with its terms and conditions, to eveiy shipment and/or risk falling within its scope and ... the Assured accepts the obligation to pay premiums on every such shipment and/or risk and the equal obligation to pay premium on shipments and/or risks not reported. All premiums are to be paid monthly at agreed rates, unless otherwise noted in this Policy.
Clause 43, “Annual Minimum Retained Premium,” provides for a minimum annual premium, plus monthly payment of additional premiums when the value of covered shipments exceeds that covered by the annual minimum. There is no suggestion that the policy’s terms and conditions are not in effect continuously from year to year until cancellation, as noted above.
In February 2005, as part of a joint venture with KO-BRITE Corporation (KO-BRITE), Kopin announced that it was transferring to China machinery used to manufacture its LED products. Since this was not new but used merchandise to be exported rather than imported, Kopin needed to change the terms of the policy in order to cover these additional goods. On February 23,2005, Richard Sneider (Sneider), Kopin’s chief financial officer, by email contacted William Mitchell (Mitchell), vice-president of GHM, in order to determine whether the policy as written covered the *37 intended shipments and, if not, how much it would cost to amend the policy. At the time, Sneider had not yet determined whether the LED machinery was to be shipped by air or by vessel.
There followed a series of email communications between Kopin and GHM regarding the details of the shipment, with a final determination, on March 4, 2005, that the shipments would be by aircraft. In a March 1, 2005, email, Donna Boutin (Boutin) of GHM contacted Meredith Atwood (Atwood) of UMI to request that the policy be amended to include exported equipment. Atwood forwarded the request to Matthew Pedersen (Pedersen) of UMI, the underwriter who had prepared and issued the initial policy. Additional emails indicate that the parties understood coverage to be limited to $4,000,000 per shipment. On March 7, 2005, Pedersen faxed an insurance quote (Quote) to GHM, containing the following provisions:
Goods: Used LED machinery and other goods incidental to the business of the insured . . .
Limits: $4,000,000 Air, Vessel under deck, $400,000 on deck
Geographic Scope: Exports, USA to Far East
Insuring Terms: All Risk as per the attached Used Machinery Clause
The Used Machinery Clause read as follows:
AVERAGE TERMS AND CONDITIONS 25 Under deck shipments consisting of Used machinery and/or Used Merchandise described below are insured:
(a) Used machinery and Used Merchandise in packing usual and approved for trade are insured
Against all risks of physical loss or damage from any external cause, irrespective of percentage .. . BUT EXCLUDING MARRING, DENTING, CHIPPING, SCRATCHING, WEAR and TEAR, RUST, OXIDATION, DISCOLORATION, MECHANICAL AND ELECTRICAL DERRANGEMENT, HOWSOEVER CAUSED.
All other terms and conditions of the captioned policy remain unchanged and in full force and effect.
Upon receipt of the Quote, GHM emailed Sneider a summary of its terms. On March 8, 2005, GHM sent an email to IMU requesting that it issue the coverage “as quoted” effective March 7, 2005. That same day Pedersen replied that the coverage was “bound” and in effect as quoted. There is no dispute that, upon Pedersen’s statement to GHM that the coverage was bound, insurance coverage by IMU in accordance with the Quote took effect. Statement of Undisputed Facts (SUF), SI 134. Accordingly, on March 8, 2005, the policy was amended to cover the export of used machinery by air up to a limit of $4,000,000. There is no dispute that Kopin paid all relevant premiums.
On May 20, 2005, IMU informed GHM that it was moving “all new and renewal business” to Northern, and offered a quote, “effective 4/20/05,” regarding the policy (referred to by the parties as the “Renewal Quote”; SUF SU38). The Renewal Quote listed “Goods Insured” as including “Used LED Machinery” with a liability limit of “$4,000,000 Air, Vessel under deck.” The insuring terms were “All Risks, per Company form . . . including . . . Used Machinery Clause . . .” The letter also stated: “[p]lease discuss our intentions with the assured and advise if they wish to continue coverage as we have quoted for the 2005/2006 policy period. Be sure to advise us right away if you have any concerns about this quote ... All other terms and conditions remain unchanged.” (Emphasis in original.)
Meanwhile, IMU had prepared two endorsements to the policy. Endorsement 2, dated April 1, 2005, and effective March 7, 2005, updated the “Geographical Limits” clause to read “At and from ports and or places in the world to ports and or places in the world.” The “Limits of Liability” clause was updated to read: ‘This company shall not be liable under this insurance for more than $4,000,000 in respect of shipments by any one vessel and connecting conveyances . . . Except that in the following cases, liability shall be further limited to . . . (b) $4,000,000 by any one aircraft and connecting conveyances . . . All other terms and conditions remain unchanged.” As noted above, the policy had previously been amended on March 8, 2005, effective March 7, 2005, to provide coverage of used equipment shipped by air up to a limit of $4,000,000; Endorsement 2 was not contrary to, nor otherwise altered, that coverage.
Endorsement 3, dated May 24, 2005, and effective March 7, 2005, read, in relevant part (and in language almost identical to that in the analogous section of the Quote), “The following clause is added in the policy. Used Machinery Clause — Average Terms and Conditions 25 ... Under deck shipments consisting of Used Machinery and/or Used Merchandise described below are insured . . . Against all risks of physical loss or damage from any external cause . . . excluding rust, oxidation, discoloration . .. howsoever caused.” Nothing in Endorsement 3 altered the “Goods Insured” clause, as amended on March 8, 2005, or otherwise altered the coverage provided pursuant to the binding Quote.
Although the merchandise was originally to be shipped on March 8, 2005, it was not; instead, on March 17 and 18, 2005, at Kopin headquarters, August Technologies, Inc. (August) packed and crated two used NSX-95 automated LED inspection systems for shipment in crates manufactured by August. On June 2, 2005, some 80 crates of LED machinery, two of which contained the NSX-95 systems, were shipped via aircraft from Boston to Hong Kong. Upon arrival, the cargo was placed in a warehouse to await customs *38 inspection. On June 9, 2005, Sneider and Mitchell exchanged emails to confirm that the policy provided coverage for the goods all the way to delivery to KO-BRITE in China. In his email, Sneider told Mitchell that the cargo had been “flown from JFK to HK” and then warehoused. GHM forwarded the email exchange to Pedersen at IMU, who replied the same day that “[a]s long as the cargo is not taken out of the due course of transit, and it does not appear that it is, it is covered all the way through until its final destination on the Bill of Lading.” GHM then forwarded the entire exchange to Sneider.
Shortly after the arrival of the LED machinery, Sneider was informed that the two NSX-95 systems had suffered rust and corrosion damage. The systems were shipped back to August in the United States for an assessment; August determined that they had been damaged beyond repair, and estimated replacement costs at $450,000. Kopin bore all the costs of shipping, warehousing, re-crating, return to the United States, and damage assessment.
In early August 2005, GHM submitted to IMU a notice of loss. Tow, Inc. (Tow), assigned by IMU to assess the damage, concluded that the machinery had suffered rust and corrosion due to exposure to a condensation environment upon arrival in Hong Kong;. Tow attributed the damage to improper packaging by August. Kopin subsequently filed a claim with IMU for coverage pursuant to the policy; IMU responded by letter dated December 22, 2005, that the Quote provided coverage for used machinery shipped by air. Relying on the language of the Quote, IMU nonetheless denied coverage on the grounds that the Used Machinery Clause, attached to the Quote (and included in Endorsement 3) excluded coverage for damage caused by rust. Although IMU noted that the Used Machinery Clause refers to “under deck shipments,” it claimed that the “intent” of the clause was to include all shipments by air or vessel.
IMU’s denial met with some consternation, particularly on the part of Mitchell, GHM’s representative. He emailed Atwood at IMU, stating that he read the Used Machinery Clause in both the Quote and Endorsement 3 as excluding rust damage only as to those goods shipped by vessel, not by air. In Mitchell’s opinion, IMU was thus obligated to provide coverage where the machinery was shipped by air. In light of Mitchell’s concerns, IMU promised to review the claim. It did so, but with no different result.
By letter dated January 10, 2006, IMU again denied coverage, this time on the grounds that the policy did not cover used machinery shipped by air. Robert Wheeler, senior claims adjuster and underwriter for IMU, testified that IMU had, in its first letter of denial, misread the policy and that the rust exclusion contained in the Used Machinery Clause did not apply to air shipments. IMU nevertheless concluded that the policy, read as a whole, and including the aforementioned endorsements, excluded coverage for used machinery shipped by air. IMU reasoned that the Endorsement 2 added exports and increased policy limits, but did not cover used machinery. Endorsement 3, according to IMU, enlarged coverage to include used machinery, but only to the extent that it was shipped by vessel.
Kopin argues that IMU’s reading of the policy ignores the plain words of the Quote, which, Kopin contends, constituted a binding contract that governed IMU’s obligations under the policy. It seeks declaratory judgment to that effect as well as $457,977.43 in damages, including the replacement costs as well as other costs incurred.
IMU, for its part, presses both arguments set forth in the two letters of denial. First, it claims that the policy as endorsed excludes coverage for used machinery exported by air. Next, it asserts that, in any event, the parties intended that, to the extent that the policy was to cover used machinery, it would do so under the terms in the Used Machinery Clause excluding damage due to rust, regardless of the method of shipment.
DISCUSSION 1. Standard of Review
Summary judgment may be granted where, viewing the evidence in the light most favorable to the non-moving party, all material facts have been established and the moving parly is entitled to judgment as a matter of law. Cabot Corp. v. AVX Corp., 448 Mass. 629, 636-37 (2007); Mass.R.Civ.P. 56(c). “The moving party must establish that there are no genuine issues of material fact, and that the non-moving party has no reasonable expectation of proving an essential element of its case.” Miller v. Mooney, 431 Mass. 57, 60 (2000). See also Pederson v. Time, Inc., 404 Mass. 14, 16-17 (1989). When the moving party does not bear the burden of proof at trial, it is entitled to summary judgment either by submitting affirmative evidence that negates an essential element of the opposing party’s case, or by demonstrating that the opposing party has no reasonable expectation of proving an essential element of its case at trial. Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991).
The interpretation of an insurance policy is a question of law for the court. Cody v. Connecticut Gen. Life Ins. Co., 387 Mass. 142, 146 (1982). Where the provisions of an insurance policy are plainly expressed, the policy must be enforced in accordance with its terms, id., and interpreted in a manner consistent with what an objectively reasonable insured would expect to be covered. McGregor v. Allamerica Ins. Co., 449 Mass. 400, 402 (2007); City Fuel Corp. v. National Ins. Co. of Hartford, 446 Mass. 638, 642-43 (2006). If, however, “the contract is ambiguous, doubts as to the meaning of the words must be resolved against the insurance company that employed them and in favor *39 of the insured.” August A. Busch & Co. of Mass. v. Liberty Mut. Ins. Co., 339 Mass. 239 243 (1959). “A term is ambiguous only if it is susceptible of more than one meaning and reasonably intelligent persons would differ as to which meaning is the proper one.” County of Barnstable v. American Fin. Corp., 51 Mass.App.Ct. 213, 215 (2001). An ambiguity is not created, however, simply because there is a controversy between the parties as to the interpretation of the policy provisions. Lumbermens Mut. Cas. Co. v. Offices Unlimited, Inc., 419 Mass. 462, 466 (1995).
2. Kopin’s Motion for Partial Summaiy Judgment A. Declaratory Judgment (Count I).
A declaratory judgment in an action provides an appropriate means of deciding a dispute concerning the meaning of language in an insurance policy. See, e.g., Boston Symphony Orchestra, Inc. v. Commercial Union Ins. Co., 406 Mass. 7, 15-16 (1989). The purpose of a declaratory judgment action is “to provide a plaintiff relief from uncertainly and insecurity with respect to rights, duties, status and other legal relations.” Shali v. Bull HN Information Systems, Inc., 437 Mass. 696, 705 (2002).
The dispute before the Court revolves around the extent to which the Quote, read together with the policy, the endorsements, and the various communications between the parties, controls coverage. Of particular importance is the sequence of events following Pedersen’s issuance of the Quote on March 7, 2005. On March 8, 2005, GHM requested that Pedersen provide coverage as quoted, and confirm the receipt of Kopin’s order. In response, Pedersen that same day emailed GHM stating “You are bound. I will set up the policy to endorse the export exposure . . .” As noted above, the Court concludes that neither the subsequent Endorsements 2 and 3, nor the Renewal Quote, submitted May 20, 2005, superseded the provisions of the Quote.
One reason the Court so concludes is that the Quote, once accepted by Kopin and acknowledged by Pedersen, constituted a temporary, binding contract, known in the industry as a “binder.” A binder is most often evidenced by written receipts, but also includes oral contracts of interim insurance. 1A Couch on Insurance, §13.3. Insurance companies issue binders, also called “temporary” or “preliminary” insurance, upon application, which constitutes a contract to cover the applicant until a formal policy issues or until such time as the insured is informed to the contrary. 1A Couch on Insurance, §13.1; Frost v. David C. Wells Ins. Agency, Inc., 14 Mass.App.Ct. 305, 310 (1992). See also DeCesare v. Metropolitan Life Ins. Co., 278 Mass. 401, 406 (1932); London Clothes, LTD. v. Maryland Cas. Co., 318 Mass. 692, 697 (1945) (“[a]n oral contract of insurance which contains all the essential elements of the transaction is valid and obligates the insurer to pay for a loss sustained subsequently to the oral contract butbefore the policy contemplated by the oral contract has been issued”). As is the case here, a “binder contract, a commercial document, is to be read in accordance with its terms and not in accordance with the unexpressed terms which a party later wishes had been written into it.” Hartford Nat. Bank & Trust Co. v. United Truck Leasing Corp., 24 Mass.App.Ct. 626, 630 (1987).
Because the Quote, as bound, continued in force “until such time as the insured is informed to the contrary,” Couch, supra, and none of the subsequent operative communications between the parties contradicted its terms, the policy as amended by the binding Quote governs defendants’ obligation to indemnify Kopin for damage to the subject equipment— i.e., to insure the used LED equipment that was shipped by air for export, up to the amount of $4,000,000.
The defendants contend that, even if the Quote governs, its incorporation of the Used Machinery Clause defeats Kopin’s claim. They argue that, even though the clause refers to “[u]nder deck shipments,” the parties actually intended it to include air shipments; hence, defendants assert, the rust exclusion applies equally to merchandise shipped by air.
Nothing in the record supports defendants’ assertion; on the contrary, the plain language of the Quote, read in concert with the original policy, indicates otherwise. The parties agree that Kopin intended, and IMU understood, coverage to include used machinery to be exported up to a $4,000,000 limit. The Quote reflects the parties’ intentions in this regard, where goods are listed as “[u]sed LED machinery,” geographic scope included exports, and coverage is limited to “$4,000,000 Air, Vessel under deck ...” The “Goods” clause therefore modifies Clause 5 of the original policy (“Goods Insured") to add used machinery. The “Limits” clause of the quote clearly modifies Clause 6 of the original policy (“Limits of Liability") to increase coverage to $4,000,000 for cargo shipped either by air or under deck in any vessel.
The Used Machinery Clause, attached to the Quote, is entitled “AVERAGE TERMS AND CONDITIONS 25.” That clause unambiguously modifies Clause 25, also entitled “Average Terms and Conditions,” which identifies covered risks to goods shipped by vessel. Nothing in the Used Machinery Clause states that it is meant to apply to cargo shipped by air, and nothing states that it is meant to modify Clause 26, which identifies covered risks to cargo shipped by air. Had IMU intended the rust exclusion to apply to air shipments, it could have inserted a provision to that effect in either Clause 26 or the Used Machinery Clause; it did neither.
Where policy provisions are plainly expressed, they must be interpreted according to their terms. MacG- *40 regor, 449 Mass. at 402. The Court therefore concludes that the rust exclusion contained in the Used Machinery Clause applies only to goods shipped by vessel and not, as the defendants urge, to air shipments.[3] Accordingly, the defendants are obligated to cover damage to used machinery due to rust that occurred during shipment by air.
While there is no genuine issue of material fact as to IMU’s indemnification obligation under the policy as amended, defendants have raised an issue with regard to the amount due under Clause 13, which specifies that goods are insured insofar as they are “valued at the amount of invoice.” That amount remains in question, and requires resolution by the finder of fact.
B. Breach of Contract (Count II).
To recover on a claim of breach of contract, a plaintiff must show (1) the existence of a contract; (2) his own performance of his material obligations under the contract; (3) the defendant’s breach of a material obligation under the contract; and (4) resulting damages. See Singarella v. City of Boston, 342 Mass. 385, 387 (1961); Precision Piping Assocs. Inc. v. City of Boston, 3 Mass.App.Ct. 148, 149 (1975); Loranger Constr. Corp. v. E.F. Hauserman Co., 1 Mass.App.Ct. 801 (1973).
There is no dispute that Kopin paid the requisite premiums and that the defendants have failed to cover the damages. Likewise, there is no dispute that damage to the LED equipment occurred while it was in transit from the United States to China. SUF ¶185. Rather, defendants argue that, even if there is coverage and the denial of coverage was improper, “clearly OneBeacon America Insurance Company and IMU should be granted Summary Judgment on the breach of contract count because they were not parties to the contract and therefore cannot be liable for its breach.” Defendants’ Memorandum of Law in Support of Their Motion for Summary Judgment, at 26.
Defendants have agreed to the following paragraphs of Kopin’s Statement of Undisputed Facts:
7. Defendants OneBeacon America Insurance Company (“OneBeacon America”) and the Northern Assurance Company of America (“Northern Assurance”) are divisions of OneBeacon Insurance Company (“OneBeacon”).
8. Defendant International Marine Underwriters (“IMU”) is the trade name of the marine insurance division of OneBeacon . . .
Thus, each of the three named defendants is a division of — not a subsidiary of or corporation separate from — OneBeacon Insurance Company.[4] Because the corporate entity will respond to Kopin’s successful claims against any of the three named divisions, and because the Court has concluded that, as to at least one of the three divisions, Kopin is entitled to summary judgment on the liability (but not damages) portion of its breach of contract claim, summary judgment will enter accordingly.
C. Violation of G.L.c. 93A (Count VI).
Kopin next argues that defendants violated G.L.c. 93A by failing to conduct a reasonable investigation, refusing promptly to make a settlement offer, and declining coverage. Defendants counter that a reasonable denial of coverage does not constitute an unfair or deceptive practice. The record before the Court raises genuine issues of material fact which preclude summary judgment on the 93A claim.
3. Defendants’ Motion for Summary Judgment
The defendants have moved for summary judgment on all claims against them. For the reasons recited above, the Court concludes that the motion should be denied as to Counts I, II, and VI. Because genuine issues of material fact remain as to Kopin’s other claims, summary judgment as to those claims will also be denied.
ORDER
For the foregoing reasons, Kopin’s motion for partial summary judgment is ALLOWED as to so much of Count I that seeks a declaration that the Ocean Marine Cargo Policy, Policy No. CM JC5019, as amended, which OneBeacon America Insurance Company issued to Kopin Corporation, provides coverage to Kopin for the loss (as defined by the policy) it sustained when used machinery that it shipped by aircraft from the United States to the Far East in the summer of 2005 was damaged by the time that machinery reached its intended destination; is ALLOWED as to liability (but not damages) under Count II; is, and is otherwise DENIED. The defendants’ motion for summary judgment is DENIED.

The parties dispute whether GHM was acting as an agent for the defendants or a broker for the plaintiff. Given the ruling herein, the Court need not address the issue.

Because of the conclusion the Court reaches, it need not address Kopin’s argument that where it did not receive Endorsements 2 and 3 until after the loss, they were not accepted and thus not valid. Nonetheless, because the binding Quote plainly stated that air shipments were covered, Kopin could reasonably have assumed, until informed otherwise, that coverage continued. See Frost v. David C. Wells Ins. Agency, Inc., 14 Mass.App.Ct. 305, 310 (1982).

Indeed, defendants refer to themselves collectively in their responses to the SUF. For example, they agree with SUF ¶101 (“In March 2005, IMU [defined in ¶8 as the collective reference to “IMU, OneBeacon America and Northern Assurance”] prepared an insurance quote (the ‘Quote’) offering to amend the terms of the Policy”). See also ¶138.