MAXWELL, J.,
for the Court:
¶ 1. This ease involves a dispute between a hardware store leveled by Hurricane Katrina and its insurer, who denied coverage for the wind damage. The trial judge granted summary judgment in the store’s favor on the wind-coverage issue, and the case proceeded to trial on damages. A jury returned a verdict of $1.17 million in the store’s favor on its insurance-contract claim against the insurer. But the trial judge directed a verdict in the insurer’s favor on the store’s tort claim for lost net profits allegedly caused by the insurer’s denial of insurance proceeds. The trial judge also denied the store’s post-trial request for attorney’s fees and pre-judgment interest. Both parties appeal.
¶ 2. As to the wind-coverage issue, we affirm the grant of partial summary judgment. The damage occurred after the insurer issued the store a written binder for all-risk coverage but before a more formal policy was delivered. Based on the circumstances surrounding the formation of this agreement to be bound to coverage and the language of the written binder and quote, we cannot find that wind was an excluded risk.
¶ 3. We also affirm the grant of a directed verdict against the hardware store for failure to prove its tort claim against the insurer. We find the trial judge properly exercised her gatekeeper role when excluding expert testimony about the hardware store’s lost net profits. Without this testimony, the store lacked evidence of the only extra-contractual damages it alleged were proximately caused by the insurer’s bad-faith refusal to pay under the contract.
¶ 4. Finally, we affirm the trial judge’s denial of the hardware store’s request for attorney’s fees and pre-judgment interest, which it sought in a post-judgment motion. As the Mississippi Supreme Court recently held, the award of attorney’s fees is not a collateral matter that the judge can address through a post-trial motion.[1] We acknowledge the trial judge’s authority to award pre-judgment interest had she found the insurer’s denial of wind coverage was in bad faith. But we find she did not abuse her discretion in finding that an ambiguity in the binder and quote gave the insurer a legitimate basis to deny wind coverage.
Background Facts
¶ 5. Coastal Hardware (Coastal) is located in Kiln, Mississippi. Prior to Hurricane Katrina, Coastal operated a 22,000 square foot retail space, containing lumber, hardware, and some clothing. Certain Underwriters at Lloyds, London (the Underwriters) are a group of underwriters that subscribed to the Certificate No. JA000700Y/0040, the particular policy that was to be issued to Coastal.[2]
¶ 6. In July 2005, Coastal worked with its insurance agent, Dan McManus of *1021 Statewide Insurance, to renew its insurance that was to expire at the end of the month. For the previous policy year (July 2004-July 2005), Coastal had obtained through Lloyds, London a named-risk policy in which flood, earthquake, and wind were not named risks. Coastal had a separate wind policy with XL Specialty Insurance. Coastal had renewed its wind policy with XL Specialty Insurance for the July 2005-July 2006 policy year but let it lapse through nonpayment after it negotiated a new contract with the Underwriters.
¶ 7. Instead of offering another named-perils policy, the Underwriters had quoted an “all-risk” policy that expressly excluded flood, earthquake, and mold. Wind was not expressly listed as an excluded risk. However, in several places, when deductibles were addressed, the quote either stated wind was “excluded” or “not required.” McManus called the Underwriters’ American agent, John Hulen, and asked if wind was covered under the offered all-risk policy. Hulen refused to state a position but instead advised Mc-Manus to read the quote himself. On July 14, McManus sent XL Specialty a fax informing the insurer that, after renewing the wind policy, Statewide had “obtain[ed] a renewal quote on [Coastal’s] fire policy [in which] we were able to include wind and hail.” McManus asked for advise on the best way to cancel the separate wind policy and, prior to Katrina, intentionally allowed the wind policy to lapse due to nonpayment of the premium.
¶ 8. Coastal accepted the Underwriters’ quote and paid the $9,800 premium. The Underwriters agreed to bind coverage beginning July 23, 2005. On July 29, the Underwriters’ agent issued a two-page written binder for an “all perils” policy, listing “mold” as the only notable exclusion. But the binder did state that Coastal should “READ THIS CONFIRMATION CAREFULLY AND COMPARE IT WITH ANY QUOTE AND SUBMISSION DOCUMENTS AND REVIEW THE POLICY FORMS FOR THE ACTUAL COVERAGE PROVIDED.” The binder also stated: “THIS INSURANCE BINDER WILL BE TERMINATED AND SUPERSEDED UPON DELIVERY OF THE FORMAL POLICY(IES) ISSUED TO REPLACE IT.” (Emphasis added).
¶ 9. According to Hulen’s records, on Wednesday, August 24, Hulen received an electronic copy of the formal policy — which contained a wind exclusion — from the Underwriters. Hulen purportedly printed a hard copy and mailed the policy to Statewide. But a representative of Statewide[3] claimed Statewide neither received the policy nor delivered it to Coastal. By Friday, August 26, the Mississippi Gulf Coast was bracing for Hurricane Katrina. Statewide closed its office early that day, having never checked the mail. When the storm struck Monday, August 29, both Statewide’s office and the U.S. post office in Kiln were destroyed. The mailed policy was never recovered.
¶ 10. The storm also destroyed Coastal’s 22,000 square foot building, forcing the hardware store to operate out of a much smaller building during hurricane recovery. Several weeks after the storm, Coastal contacted Hulen to make a claim. In a brief phone conversation, Hulen told Coastal that the policy did not cover wind damage and that Coastal should make a claim with its wind carrier.
Procedural History
¶ 11. Coastal sued the Underwriters, seeking both damages under the insurance contract and tort damages. Both parties moved for partial summary judgment on *1022 the issue of coverage under the insurance contract.
¶ 12. Mississippi Rule of Civil Procedure 56(c) directs that summary judgment “shall be rendered ... if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.”[4] “Under Mississippi law, the interpretation of an insurance policy is a question of law, not one of faet[,]” so this issue was appropriate for summary judgment. Shelter Mut. Ins. v. Simmons, 543 F.Supp.2d 582, 585 (S.D.Miss.2008) (citing Noxubee Cnty. Sch. Dist. v. United Nat’l Ins., 883 So.2d 1159, 1165 (¶ 13) (Miss.2004)). The day before trial, the trial judge granted partial summary judgment in Coastal’s favor, finding that, through the insurance binder, the Underwriters had agreed to cover wind damage.
¶ 13. With coverage deemed established, trial proceeded on the issue of contract damages — what amount Coastal was owed under the policy. The jury heard evidence on this issue and awarded Coastal $1.17 million under the insurance policy. But Coastal’s tort claim for lost net profits never reached the jury.
¶ 14. As to Coastal’s tort claim — that the Underwriters’ willful and/or negligent failure to pay Coastal under the policy led to lost profits it would have realized if it had been able to timely invest the insurance proceeds it was due — the trial judge held Coastal’s accounting expert could not testify about lost net profits. Coastal’s tort claim for lost profits was separate from its claim for losses due to business interruption, a loss covered under the insurance contract.[5] The trial judge excluded the expert’s testimony on lost net profits, finding the accountant could not identify the differences between business-interruption loss and lost net profits in a way that would not confuse the jury. The judge also found the expert, in his report and deposition, had failed to address lost net profits but instead opined about lost market share and lost gross sales.
¶ 15. The only tort damages Coastal sought to prove to the jury were damages for lost profits. And having excluded Coastal’s only evidence of lost net profits proximately caused by the Underwriters’ allegedly negligent denial of coverage, the trial judge directed a verdict in the Underwriters’ favor on Coastal’s tort claim.
¶ 16. The trial judge did submit the issue of punitive damages to the jury, which found punitive damages should not be assessed against the Underwriters.
¶ 17. After a judgment was entered, Coastal moved to alter and amend the judgment, seeking an award of prejudgment interest, attorney’s fees, and litigation expenses. See M.R.C.P. 59(e). Because the jury did not find the Underwriters’ denial of coverage warranted punitive damages, and because the trial judge likewise found no bad faith, she denied Coastal’s request. Coastal also moved for a new trial on its tort claim, arguing its expert testimony on lost net profits was wrongly excluded.[6] This motion was also denied.
*1023 ¶ 18. Both sides now appeal. Coastal claims the trial judge improperly excluded expert testimony on lost net profits and thereby wrongly granted a directed verdict on its tort claim. Coastal also appeals the denial of its post-trial motion to alter or amend the judgment to include pre-judgment interest and attorney’s fees.
¶ 19. The Underwriters cross-appeal the partial grant of summary judgment on the coverage issue.[7]
Discussion
I. Coverage Under the Insurance Contract
¶ 20. We begin with the Underwriters’ cross-appeal and the issue of coverage, reviewing the grant of summary judgment de novo. See Clark v. Moore Mem’l United Methodist Church, 538 So.2d 760, 762 (Miss.1989) (citation omitted).

A. Recognizing the Binder as the Insurance Contract

¶ 21. We must first clarify that the undelivered policy was not the insurance contract in force at the time of Hurricane Katrina—the binder was.
¶ 22. “[A] binder is a contract for temporary insurance, until either a permanent policy can be written or its issuance approved or disapproved by the insuror.” Miss. Farm Bureau Mut. Ins. v. Todd, 492 So.2d 919, 929 (Miss.1986) (citations omitted). “A binder is not an insurance policy but is generally taken to be a contract providing for interim insurance effective as of the date of the application and terminating at either completion or rejection of the principal policy.” 1A Stephen Plitt, Daniel Maldonado, & Joshua D. Rogers, Couch on Insurance § 13:1 (Rev. ed.2010). Mississippi recognizes binders as enforceable insurance contracts. See Todd, 492 So.2d at 929. “Although a binder may be sketchy and informal in comparison with the policy contemplated for issuance and delivery in the future, it is a contract of insurance [at present], subject only to the conditions that it imposes.” 1A Couch on Insurance § 13:1.
¶ 23. The Underwriters argue the trial judge erred by finding the written binder, which incorporated the quote, was “the final insurance contract.” We do agree that the binder anticipated a future formal policy. But the binder expressly stated it did not terminate “until delivery” of that policy. Since it is undisputed that the Underwriters’ 2005-2006 policy was never delivered, the binder never terminated. So the trial court was correct that the binder was the temporary insurance contract effective at the time of Coastal’s loss.

B. Construing the Binder

1124. Because the binder expressly “incorporate^] the terms of the prospective policy,” the question becomes—What was the scope of the policy Coastal intended to purchase and the Underwriters intended to issue? See Alea London Ltd. v. Bono-Soltysiak Enters., 186 S.W.3d 403, 410 (Mo.Ct.App.2006) (“When a loss occurs after coverage has been bound but before the issuance of a policy, the question of the scope of coverage is resolved by determining the amount of coverage contemplated by the binder.”).
¶ 25. We cannot answer this question by simply looking to the terms of the *1024 undelivered, unaccepted formal policy. As the Eighth Circuit has observed:
[ I]f binders are always to be read as including all of the limitations and exclusions that may turn up in the written policy when eventually issued, and if this rule is applied even to written policies issued after the occurrence of a loss, then the oral contract can be rendered completely nugatory by the unilateral act of one party to it, the insurance company.
Hilt Truck Lines, Inc. v. Riggins, 756 F.2d 676, 678 (8th Cir.1985).
¶ 26. Instead, we are guided by Mississippi Supreme Court precedent, which has looked to the circumstances surrounding the formation of the binder as well as the language of the written binder to determine coverage. Todd, 492 So.2d at 930; Gulf Nat'l Bank v. Hartford Fire Ins., 264 So.2d 401, 403 (Miss.1972). And after considering the relevant circumstances and language, we, like the trial judge, conclude that the binder covered Coastal’s wind damage.

1. The Circumstances

¶ 27. The Underwriters argue that, in finding the binder covered wind damage, the trial judge ignored the past dealings between Coastal and the Underwriters. As support, the Underwriters latch to the following language from Todd: “The general rule permits the essential terms of an insurance binder to be supplied by implication, but these terms must be readily infer-able from the prior course of dealing between the parties[.]” Todd, 492 So.2d at 930. They argue that to find the insurance contract covered wind damage would be to infer a term not in the binder. And because wind was not covered in the 2004-2005 policy, such an inference is not “readily inferable from the prior course of dealings.”
¶28. While this general rule perhaps applies where prior dealings mirror recent negotiations, here they do not. The contract for coverage in 2005-2006 was not merely a “renewal” of the 2004-2005 named-peril policy. Rather, the undisputed evidence showed Coastal was instead receiving expanded coverage through an all-risk policy.
¶ 29. This was certainly a distinctive change. “ ‘Named perils’ or ‘specific perils’ policies provide coverage only for the specific risks enumerated in the policy and exclude all other risks. ‘All-Risk’ policies provide coverage for all risks unless the specific risk is excluded.” Robichaux v. Nationwide Mut. Fire Ins., 81 So.3d 1030, 1039 n. 5 (Miss.2011) (quoting 7 Stephen Plitt, Daniel Maldonado, & Joshua D. Rogers, Couch on Insurance § 101:7 (3d ed.2006)). Further, with named-peril coverage, the insured “has the burden of proving that any losses were caused by a peril covered by the policy.” Tuepker v. State Farm Fire & Cas. Co., 507 F.3d 346, 356 (5th Cir.2007) (citing Lunday v. Lititz Mut. Ins., 276 So.2d 696, 699 (Miss.1973)). But with all-risk coverage, while the insured “still has the basic burden of proving his right to recover[,] ... the insurer bears the burden of proving that a particular peril falls within a policy exclusion[.]” Id. (quoting Leonard v. Nationwide Mut. Ins., 499 F.3d 419, 429 (5th Cir.2007)).
¶ 30. Consequently, the question of wind-damage coverage cannot be resolved by simply looking at the 2004-2005 named-perils policy, in which wind was not a named peril. By offering an all-risk policy, the Underwriters were offering to cover all risks, unless specifically excluded. So it is actually the Underwriters, not Coastal, that ask us to infer from the prior dealings that wind was an excluded risk from the all-risk coverage being offered.
*1025 ¶ 31. Looking at the course of dealings between the parties, we cannot make such an inference. We note that Coastal’s agent, McManus, specifically asked the Underwriters’ agent, Hulen, if the 2005 quote for an expanded all-risk policy included wind. And Hulen admitted he did not inform McManus that wind was a specifically excluded risk. Hulen instead directed McManus to the language of the written binder to answer his question about wind-damage coverage. Thus, we cannot readily infer from the circumstances that the Underwriters intended to exclude wind, when they chose to rely on the written language of the binder and quote.

2. The Language of the Binder

¶ 32. Looking to the language of the binder, which incorporated the language of the quote by reference, the trial judge found that, at best, there was an ambiguity as to whether wind was an excluded risk. See Todd, 492 So.2d at 930 (looking to express terms of written binder to supply terms for oral binder); Gulf Nat’l Bank, 264 So.2d at 403 (looking to “the language of the binder itself’ in addition to “the circumstances” to find coverage); see also Hartford Nat’l Bank & Trust Co. v. United Truck Leasing Corp., 24 Mass.App.Ct. 626, 511 N.E.2d 637, 640 (1987) (“The binder contract ... is to be read in accordance with its terms and not in accordance with unexpressed terms which a party later wishes had been written into it.”).
¶ 33. The quote stated the Underwriters were offering “All risk of Physical Loss or Damage excluding Flood and Earthquake.” In addition to listing flood and earthquake as exclusions in the quote, the binder listed “mold” as the only “notable exclusion.” But neither the binder nor the quote specified that wind was an exclusion. It is only in sections of the quote and binder not dealing with exclusions but rather deductibles that the deductible for wind is listed as “excluded.” And in another section, the quote stated “not required” next to the line item for “WindStorm Cover.” We agree this creates an ambiguity.
¶ 34. The Underwriters argue the trial judge erred in construing the ambiguity against the drafter (the Underwriters) and in favor of coverage — finding wind was not a specifically excluded risk. In particular, the Underwriters insist that trial judges should not apply the canons used to construe insurance policies to the language of an insurance binder. We disagree.
¶ 35. Indeed, the general rule is that “a contract of temporary insurance is subject to the same rules of construction as any ordinary contract of insurance.” 1A Couch on Insurance § 13:6 (Rev. ed.2010).
¶ 36. Under these rules of construction:
• when the words of an insurance policy are plain and unambiguous, the court will afford them their plain, ordinary meaning and will apply them as written;
• any ambiguities in an insurance contract must be construed against the insurer and in favor of the insured and a finding of coverage; and
• provisions that limit or exclude coverage are to be construed liberally in favor of the insured and most strongly against the insurer.
Simmons, 543 F.Supp.2d at 585 (citing Noxubee Cnty. Sch. Dist., 883 So.2d at 1165 (¶ 13); Nationwide Mut. Ins. v. Garriga, 636 So.2d 658, 662 (Miss.1994)).
¶ 37. And the rule that ambiguity is construed in favor of the insured and a finding of coverage applies to binder language just as it would to formal policy language. 1A Couch on Insurance § 13:6 (Rev. ed. 2010) (“In accordance with the general rule of construction, a binding re *1026 ceipt that is ambiguous is to be construed in favor of the insured.”); see also Sparks v. Shelter Life Ins., 838 F.2d 987, 989 (8th Cir.1988) (“Binding or conditional receipts are subject to the rules of construction generally utilized in interpreting insurance policies; if the provisions are ambiguous, making them susceptible to two reasonable constructions, one favorable to the insurer and one favorable to the insured, the latter will be adopted.”); Alea London Ltd., 186 S.W.3d at 412 (“With respect to the construction of binders in particular, a binder which is ambiguous should be construed in favor of the insured.”); DeFoure v. MFA Life Ins., 268 Ark. 829, 596 S.W.2d 7, 9 (Ark.Ct.App.1980) (“It is settled law that ambiguities in insurance contracts will be construed against the insurer who prepared it. Binding or conditional receipts are subject to this rule of construction.”).
¶ 38. Thus, we find nothing radical in the trial judge’s approach where she resolved the ambiguity in favor of the insured and applied the same principles to find in favor of Coastal on the issue of coverage. While the Underwriters argue this approach unfairly penalizes insurers for not listing in the temporary contract every exclusion that will appear in the later formal policy, we find no such penalty arising under these circumstances. When Hulen was given the opportunity to explain to Coastal’s agent whether the Underwriters intended to exclude wind, Hulen did not discuss the future policy but instead relied on the language of the binder and quote, without any further comment. According to the Underwriters’ own representative, the answer about wind coverage could be found in the binder and quote. And because the language of the binder and quote did not plainly and unambiguously specify wind as an excluded risk, we, like the trial judge, construe the binder in favor of the insured and find wind was a covered risk.
¶ 39. We affirm the judgment for $1.17 million in contract damages based on the trial judge’s grant of partial summary judgment on the coverage issue.
II. Exclusion of Expert Testimony
¶ 40. We now address Coastal’s issues on appeal.
¶ 41. Coastal seeks reversal of the grant of a directed verdict against Coastal on its tort claim and urges that we remand this claim for a new trial. Specifically, Coastal argues the directed verdict was improper because it resulted from an erroneous evidentiary ruling. While we review a grant of a directed verdict de novo, Solanki v. Ervin, 21 So.3d 552, 556 (¶ 8) (Miss.2009), “[o]ur well-settled standard of review for the admission or suppression of evidence is abuse of discretion.” Miss. Transp. Comm’n v. McLemore, 863 So.2d 31, 34 (¶ 4) (Miss.2003).

A. Coastal’s Tort Claim

¶ 42. In addition to its insurance-contract claim, Coastal sought extra-contractual damages, alleging the Underwriters’ grossly negligent and/or willful refusal to pay under the insurance contract rose to the level of an independent tort, or “bad faith.” See United Servs. Auto. Ass’n (USSA) v. Lisanby, 47 So.3d 1172, 1178 (¶ 18) (Miss.2010) (explaining level of malfeasance an insured must show to be entitled to extra-contractual damages); see also Fulton v. Miss. Farm Bureau Cas. Ins., 105 So.3d 284, 288 (¶ 20) (Miss.2012) (citing Universal Life Ins. v. Veasley, 610 So.2d 290, 295 (Miss.1992)) (discussing extra-contractual damages as an “intermediate form of relief1' between contractual and punitive damages). The only type of extra-contractual damages Coastal alleged and sought to prove at trial were lost profits it would have realized post-Katrina, *1027 had the Underwriters paid under the contract and had Coastal been able to use that money to reopen a 22,000 square foot retail space, instead of operating out of a much smaller building.
¶ 43. Lost profits are recoverable as extra-contractual damages “as long as such profits are proved with reasonable certainty, not based on speculation or conjecture.” Lovett v. E.L. Garner, Inc., 511 So.2d 1346, 1353 (Miss.1987). The particular lost profits that must be proved are “net profits as opposed to gross profits.” Id. (citations omitted) (“To ascertain net profits, a party must deduct such items as overhead, depreciation, taxes and inflation”).
¶ 44. Coastal sought to prove lost net profits through its accounting expert. The trial judge had accepted the expert as a qualified expert in accounting and permitted him to testify about Coastal’s contractual damages due to business-interruption loss. But the trial judge excluded his testimony about any extra-contractual damages in the form of lost net profits.
¶ 45. Without this testimony, Coastal had no evidence to prove lost net profits to a reasonable certainty. See id. Coastal does not dispute that without this evidence a directed verdict was proper. See Troupe v. McAuley, 955 So.2d 848, 858 (¶ 28) (Miss.2007) (holding directed verdict was proper because, “when considering all the evidence offered during the plaintiffs casein-chief, as well as all reasonable inferences which could be drawn from the evidence, all in the light most favorable to the plaintiff, the plaintiff was unable to make out a prima facie case”). Rather, Coastal argues that, but for the trial judge’s abusing her discretion and excluding the evidence, its tort claim would have survived the Underwriters’ motion for a directed verdict.

B. Tidal Judge’s Evidentiary Ruling

¶ 46. “The trial judge assumes the critical role as a gatekeeper in assessing the value of [proffered expert] testimony.” Webb v. Braswell, 930 So.2d 387, 397 (¶ 16) (Miss.2006) (citing McLemore, 863 So.2d at 39 (¶ 21)). “The trial judge has the sound discretion to admit or refuse expert testimony; ... [and] the judge’s decision will stand unless the discretion he used is found to be arbitrary and clearly erroneous.” Troupe, 955 So.2d at 856 (¶ 19) (quoting Poole v. Avara, 908 So.2d 716, 721 (¶ 8) (Miss.2005)). Because we find the trial judge’s decision to refuse the expert testimony on lost net profits was neither arbitrary nor clearly erroneous, the judge’s evidentiary ruling stands. And consequently, so does the grant of a directed verdict on Coastal’s tort claim.[8]
¶ 47. To get past the gatekeeper, expert testimony must be both relevant and reliable. See M.R.E. 702. To be relevant, and thus admissible, expert testimony must “assist the trier of fact to understand the evidence or to determine a fact in issue[.]” Id.; see also Century 21 Deep S. Props., Ltd. v. Corson, 612 So.2d 359, 370 (Miss.1992). Here, the judge found the expert’s lost-net-profits testimony would not assist the jury to do either.
¶ 48. First, the judge found the expert failed to connect his projected lost profits to the Underwriters’ failure to pay under the insurance contract. Thus, the judge was skeptical whether his testimony would assist the jury in determining whether any damages were proximately caused by the Underwriters’ alleged bad faith refusal to pay. See Se. Med. Supply, Inc. v. Boyles, *1028 Moak & Brickell Ins., 822 So.2d 323, 328 (¶ 14) (Miss.Ct.App.2002) (citation omitted) (“requir[ing] that both the existence of lost profits damages as well as the showing that the cause of the lost profits is due to the breach must be shown with reasonable certainty”).
¶ 49. Second, the judge found the expert’s lost-net-profits testimony too confusing to aid the jury in understanding the evidence. The trial judge was troubled that the expert could not distinguish lost-net-profits from business-interruption losses in a way that would assist the jury in determining extra-contractual damages, versus contractual damages. Further, the expert could not explain how he arrived at a net-loss figure, versus a gross-loss figure, in a way that would assist the jury.
¶ 50. Interestingly, Coastal’s argument for why the trial judge erred in excluding the lost-net-profits evidence was that the judge “misunderstood” how the expert had calculated lost net profits. Coastal also asserts the trial judge improperly stepped into the role of fact-finder when excluding the evidence. Though Coastal describes the misunderstanding as a factual disagreement between the judge and expert about what expenses to subtract in arriving at a net figure, we disagree and instead find the trial judge was properly exercising her role as gatekeeper.
¶ 51. To be admissible, expert testimony has to “assist the trier of fact to understand the evidence.” M.R.E. 702. And by Coastal’s own characterization, the way its expert presented the issue of lost net profits created a misunderstanding about whether his figures were for lost net profits, lost gross profits, or lost gross sales. Because of this potential for confusion, we find the trial judge did not abuse her discretion by excluding this evidence under Rule 702.
¶ 52. The exclusion of Coastal’s expert’s testimony was also based on his failure to disclose his lost-net-profits calculations in his pretrial expert report or deposition, as required under Mississippi Rule of Civil Procedure 26(b) and (f). Recently, the Mississippi Supreme Court held a trial judge failed in his gatekeeper role when he permitted an expert to testify about future medical expenses “when the substance of his opinion in that regard was not provided to [opposite] counsel prior to trial.” Bailey Lumber & Supply Co. v. Robinson, 98 So.3d 986, 997-98 (¶¶-29-31) (Miss.2012). The supreme court explained that the expert-testimony-disclosure requirement of Mississippi Rule of Civil Procedure 26(b)(4)(A)(i) “means that the substance of every fact and every opinion which supports or defends the party’s claim or defense must be disclosed and set forth in meaningful information which will enable the opposing side to meet it at trial.” Bailey Lumber, 98 So.3d at 997 (¶ 30) (quoting Nichols v. Tubb, 609 So.2d 377, 384 (Miss.1992)).
¶ 53. Coastal suggests that, because of the way its expert addressed overhead expenses, what its expert called “gross profits” in his report and deposition were also the “net profits.” So as Coastal sees it, the Underwriters were by no means ambushed because Coastal’s lost-net-profits figures had already been disclosed. But Rule 26(b) requires an expert’s disclosure to be “set forth in meaningful information which will enable the opposing side to meet it at trial.” Bailey Lumber, 98 So.3d at 997 (¶ 30). And here, the judge found the disclosures for lost net profits were not presented in a meaningful way since it appeared the expert was only calculating lost gross profits and not the required lost net profits. Also, the fact it was not readily apparent from the expert’s report or deposition whether he was presenting lost-net-profits calculations — versus those for *1029 lost gross profits, lost net sales, or lost market share — further underscores the judge’s decision that his testimony was confusing and would not help the jury decide if extra-contractual damages were warranted.
¶ 54. Having evaluated the trial judge’s reasons for excluding the testimony about lost-net-profits evidence, we find no abuse of her discretion in exercising her role as gatekeeper and excluding the proposed expert testimony. Thus, we affirm the grant of a directed verdict against Coastal on its tort claim.
III. Denial of Post-Judgment Motion
¶ 55. Coastal’s final issue is with the trial judge’s denial of its Rule 59 motion to alter or amend the $1.17 million judgment to add attorney’s fees, expenses, and pre-judgment interest. See M.R.C.P. 59(e) (governing post-trial motions to alter or amend filed within tens days of the entry of the judgment). Our review of the denial a Rule 59 motion is limited to abuse of discretion. Fulton, 105 So.3d at 287 (¶ 9).

A. Attorney’s Fees and Expenses

¶ 56. Coastal argues the trial judge legally erred by holding that she would not award attorney’s fees and expenses because the jury had not awarded punitive damages. Coastal relies on Universal Life Insurance Company v. Veasley, which holds attorney’s fees may be awarded to insureds as extra-contractual damages when there is no arguable basis to deny coverage, even though the circumstances do not warrant punitive damages. See Veasley, 610 So.2d at 295.
¶ 57. Considering the procedural posture of Coastal’s request, we turn to a recent, factually similar case, where the supreme court distinguished Veasley because it did not address a post-judgment request for attorney’s fees. Fulton, 105 So.3d at 290 (¶ 20). In Veasley, the jury had awarded extra-contractual damages, even though it declined to award punitive damages, and the supreme court affirmed the award. Veasley, 610 So.2d at 292, 295. But in Fulton, the insured, who had prevailed against his insurer at trial but had not been awarded punitive damages, had requested attorney’s fees in a Rule 59 motion to alter or amend. Fulton, 105 So.3d at 286 (¶ 7), 287-88 (¶¶ 13-19). While the supreme court acknowledged that “Veasley permits an award of attorney’s fees without an award of punitive damages,” the court clarified that “Veasley does not stand for the proposition that attorney[’s] fees may be awarded post-trial[.]” Id. at 290 (¶ 27).
¶ 58. Instead, when an insured, like any other successful litigant, requests attorney’s fees and expenses post-judgment, “[a]bsent some statutory authority or contractual provision, attorneys’ fees cannot be awarded unless punitive damages are also proper.” Id. at 287-88 (¶ 16) (quoting Miss. Power & Light Co. v. Cook, 832 So.2d 474, 486 (¶ 40) (Miss.2002)). “If independent grounds for attorney’s fees exist, a trial judge may award such fees collaterally. But if the jury does not award punitive damages, attorneys’ fees are clearly not to be awarded by the trial judge.” Id. at 288 (¶ 16) (internal citations an quotations omitted).
¶ 59. Here, no statute or contractual provision created the right to attorney’s fees. And the supreme court in Fulton emphasized that “Veasley does not create an independent right to attorney’s fees.” Fulton, 105 So.3d at 290. Because the jury did not award punitive damages, the trial judge had no authority to award attorney’s fees as a collateral matter post-judgment. See id. at 287-88 (¶¶ 14-19).
*1030 ¶ 60. Since Coastal had no post-judgment right to attorney’s fees and expenses, its request fell under the standard for a Rule 59(e) motion to alter or amend. Id. at 287 (¶ 15). “[T]o succeed on a Rule 59(e) motion, the movant must show: (i) an intervening change in controlling law, (ii) availability of new evidence not previously available, or (iii) need to correct a clear error of law or to prevent manifest injustice. Brooks v. Roberts, 882 So.2d 229, 233 (¶ 15) (Miss.2004). Coastal makes no argument that any of those three circumstances are present here.
¶ 61. Thus, we find no abuse of discretion in the trial judge’s denial of Coastal’s request for attorney’s fees and expenses.

B. Pre-judgment Interest

¶ 62. In contrast to attorney’s fees and expenses, “Mississippi [does] ree-ognize[] judicial authority to award prejudgment interest to a prevailing party in a breach of contract suit.” Moeller v. Am. Guar. & Liab. Ins., 812 So.2d 953, 958 (¶ 11) (Miss.2002) (citation omitted); see also Arcadia Farms P’ship v. Audubon Ins., 77 So.3d 100, 105 (¶ 18) (Miss.2012) (“As a general rule, ‘in actions for a breach of contract of insurance, when the amount which the insured is entitled to under the contract is withheld after payment is due, interest on such amount can be allowed as damages.’ ” (quoting State Farm Mut. Auto. Ins. v. Bishop, 329 So.2d 670, 673 (Miss.1976))). “For interest to be allowed, the amount due must have been liquidated when the claim was originally made, or the denial of the claim must have been frivolous or in bad faith.” Arcadia Farms P’ship, 77 So.3d at 105 (¶ 18) (citing Moeller, 812 So.2d at 958 (¶ 11)). Conversely, “interest may be denied where there is a bona fide dispute as to the amount of damages as well as the responsibility for the liability therefor.” Id. (quoting Simpson v. State Farm Fire & Cas. Co., 564 So.2d 1374, 1380 (Miss.1990), abrogated on other grounds by Upchurch Plumbing, Inc. v. Greenwood Utils. Comm’n, 964 So.2d 1100, 1118 (¶ 45) (Miss.2007)).
¶63. “The purpose of prejudgment interest is not to penalize wrongdoing,” but rather to “compensate[ ] insureds for the time value of money.” Id. at (¶ 19) (citations omitted). “The decision to award such interest rests within the trial [judge]’s discretion.” Id.
¶ 64. The trial judge found there was a bona fide dispute not only over the amount of damages but also over whether the Underwriters were responsible to pay for wind damages. Though the trial judge held that, because of this ambiguity, the Underwriters were bound to provide Cos-tal coverage for wind damage, the judge reasoned that the ambiguity did create a legitimate reason for the Underwriters to dispute coverage. In United States Fidelity & Guaranty Company of Mississippi v. Martin, 998 So.2d 956, 971 (¶ 50) (Miss.2008), the supreme court held “that an insurance company could legitimately deny coverage under a policy that has ambiguous provisions for coverage.” Because we too find the binder and quote were ambiguous as to whether wind was an excluded risk, we find the trial judge did not abuse her discretion by finding the Underwriters did not act frivolously or in bad faith in denying coverage. We thus affirm the denial of pre-judgment interest.
¶ 65. THE JUDGMENT OF THE HANCOCK COUNTY CIRCUIT COURT IS AFFIRMED. ALL COSTS OF THIS APPEAL SHALL BE DIVIDED EQUALLY BETWEEN THE APPELLANT/CROSS-APPELLEE AND THE APPELLEES/CROSS-APPELLANTS.
*1031 LEE, C.J., IRVING AND GRIFFIS, P JJ., BARNES, ISHEE, ROBERTS, FAIR AND JAMES, JJ., CONCUR. CARLTON, J., CONCURS IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION.

. Fulton v. Miss. Farm Bureau Cas. Ins., 105 So.3d 284, 288 (¶ 16) (Miss.2012).

. Lloyds, London is not an insurance company but instead provides a market for the buying and selling insurance risk among its individual members. Corfield v. Dallas Glen Hills LP, 355 F.3d 853, 857-58 (5th Cir.2003). So Coastal's insurer was not Lloyds but instead the members, or underwriters, who agreed to buy the risk of insuring Coastal’s property.

. McManus died in 2007, prior to giving any sworn testimony in this case.

.Further, "[a] summary judgment, interlocutory in character, may be rendered on the issue of liability alone, although there is a genuine issue as to the amount of damages.” M.R.C.P. 56(c).

. Coastal's $1.17 million award included $20,000 for losses for business interruption.

. Coastal additionally moved for a new trial on the issue of punitive damages but appeals neither the denial of this aspect of its post- *1023 trial motion nor the underlying jury verdict denying punitive damages.

. The Underwriters also claim in their cross-appeal that the trial judge erred in prohibiting their representative at trial from speaking with their counsel after the representative had testified as an adverse witness. Because we find there are no issues to remand, we do not address this issue.

. Because we find that Coastal failed to present evidence of damages, we decline to address whether Coastal presented a prima facie case on the required element of bad faith.