Billings, Thomas R, J.
The plaintiff (“Catlin”) issued two Professional and Pollution Legal Liabiliiy Insurance Policies in consecutive years to the defendants (“AMSC” and its subsidiary, “Windtec”). In this action, it seeks a declaration that the insureds were late in reporting a claim made against them during the first policy period and that for this and other, unrelated reasons, there is no coverage (Counts II and III); that Catlin is entitled to rescind the second (2011) policy (Count I); and that Catlin is entitled to recoup amounts it has paid to defend the claim (Count IV). Before me are Catlin’s motion for summary judgment as to Count II or, alternatively, Count I, and the defendants’ two cross motions for partial summary judgment on the late reporting and rescission issues.
For the reasons that follow, Defendants’ Motion for Summary Judgment on Reporting Requirement (Paper #15) is DENIED; Defendants’ Motion for Summary Judgment on Plaintiffs Rescission Claim (Paper #16) is DENIED; and Catlin Specialty Insurance Company’s Motion for Partial Summary Judgment (Paper #18) is ALLOWED, with partial summary judgment to issue as set forth in the Order below.
FACTS
On the record jointly submitted by the parties, the following facts are not subject to genuine dispute.
Catlin is a specialty insurer, incorporated in Delaware and headquartered in Atlanta, Georgia.
AMSC is an energy technology company also incorporated in Delaware, with headquarters in Devens, Massachusetts, from which its executive functions are carried out. AMSC has a satellite office in Pennsylvania and two in Wisconsin. All but two of AMSC’s senior executives worked, in 2010 and 2011, out of its Devens headquarters; the other two were located in Middleton, Wisconsin. AMSC has no physical presence in New York. Windtec, one of approximately ten AMSC subsidiaries variously located in Europe, Asia and Australia, is incorporated and headquartered in Austria.
In 2010 and 2011 Joseph Tocci, AMSC’s Assistant Treasurer working out of its Devens headquarters, was responsible for its insurance matters. He asked representatives at the Boston office of the insurance brokerage Marsh USA, Inc. to prepare an insurance program for AMSC and its subsidiaries, to include a contractor’s professional liability insurance policy. With the assistance of two of its brokers (Mitch Lockamy and Richard Klepper) in its New York City office, Marsh obtained a quote for a professional liability policy from an underwriter, Rahsaan Nurullah, who worked for Catlin out of its Chicago office.
Tocci subsequently executed an application out of Devens, which Marsh submitted to Nurullah. At Tocci’s request, Klepper asked that Catlin bind coverage on the policy. Catlin agreed, and on March 31, 2010 an underwriting assistant (Chandra Davis, in Catlin’s Atlanta office) e-mailed the contractor’s professional liability binder to Klepper in New York. The following day, a Marsh Senior Vice President (Sarah Stevenson in the Boston office) forwarded this, along with binders written by other insurers for different coverages (general liability, auto, workers’ compensation, umbrella, excess liability, and fidelity bond) to Tocci, apparently by U.S. mail. Not until June 1,2010, with apologies for the delay and thanks for his patience, did Davis email the actual policy from Atlanta to Klepper in New York. Tocci received it at his Devens office, but could not recall whether it came by email or snail-mail.
The 2010 policy (Contractor’s Protective Professional and Pollution Legal Liabiliiy Insurance Policy, Policy No. CPL-99976-0411) listed AMSC as the named insured. It had a coverage limit of $10 million, a deductible of $250,000 per claim for each of the professional and pollution liabiliiy coverages, an annual premium of $185,000, and a policy period ofApril 1, 2010 to April 1, 2011. It bore the following notice at the top of the first page (of two) of the Policy Declarations, and again at the top of the first page of the policy itself:[1]
THIS IS A CLAIMS MADE AND REPORTED POLICY AND SUBJECT TO ITS PROVISIONS APPLIES ONLY TO CLAIMS WHICH ARE BOTH FIRST MADE AND REPORTED TO THE INSURER DURING THE POLICY PERIOD OR THE EXTENDED REPORTING PERIOD,][2]] IF APPLICABLE. CLAIM EXPENSES ARE INCLUDED WITHIN THE LIMIT OF LIABILITY.
PLEASE READ THE ENTIRE POLICY CAREFULLY.
Further down the first page of the policy, in Section I (titled “INSURING AGREEMENT”), Catlin committed itself to pay a covered “Professional Claim first made against the Insured during the Policy Period and reported to the Insurer during the Policy Period, Automatic Extended Reporting Period or the Optional Extended Reporting Period if applicable,” provided certain additional conditions (none relevant here) were met. The same reporting condition was repeated on *95 page 2 in Section II (“DEFENSE AND SETTLEMENT”), with respect to the insurer’s duty to defend. Finally, there was a choice-of-law clause: ‘This policy shall be subject interpretation [sic] under the law of the State of New York.”
On December 6, 2010 a Windtec customer, Ghodawat Energy Pvt. Ltd. (“Ghodawat”), notified Windtec that it was terminating a 2008 license agreement between the two due to technical problems with the wind turbine which was the subject of the agreement and which Windtec had supplied and installed. Ghodawat is incorporated and headquartered in India; its complaint concerned a project there; and the license agreement gave it rights to use Windtec technology in India, Bangladesh, Sri Lanka, and South Africa. The letter leveled an accusation of gross negligence, and promised that, “unless some amicable resolution is reached between the parties,” Ghodawat would be pursuing a “claim for all the losses we have incurred and will continue to incur” in the wind turbine project.
Windtec immediately notified AMSC’s senior management, including its Chief Financial Officer (David Hemy) and its General Counsel (John Powell), of the Ghodawat letter. Both work at AMSC’s Devens headquarters. Powell analyzed the claim in a “Loss Contingency Memo,” concluding that a loss was probable and would likely be in the range of $500,000 to $1.3 million, and suggesting a reserve of $500,000. Catlin was not notified of the letter or the claim.
Powell wrote to Ghodawat on February 18, 2011, denying its allegations but confirming the termination of the license agreement, and suggesting a meeting to explore settlement. The meeting was held on March 23 at AMSC’s Devens headqurters, at which time the Ghodawat representative made a demand for four to five million euros. AMSC countered with an offer of _50,000. The meeting terminated without a resolution, and without AMSC reporting the situation to Catlin. For purposes of these Motions, AMSC concedes that the December 6, 2010 letter coupled with the March 23, 2011 meeting constituted a “claim” within the meaning of the 2010 policy, and Catlin does not contend that the Ghodowat claim was asserted before the March 23, 2011 meeting.
Meanwhile, about a week after Powell sent his February 18 letter to Ghodawat, Tocci executed an application at AMSC’s Devens office for a second year of coverage with Catlin. Questions 8(a) and (b) inquired whether any “claim, suit, notice, or legal action” had been made or brought against AMSC, and whether AMSC was “aware of any other circumstances or incidents which may result in a claim being filed against [it].” Tocci asked Powell to provide the responses. Powell instructed Tocci to respond “No” to each, and he did so. Henry reviewed the application and left these answers intact. In signing the application, Tocci “undert[ook] to inform the insurers of any material alteration to these facts occurring before completion of the contract of insurance.”
Catlin still knew nothing of the Ghodawat claim. Mr. Nurullah (the same underwriter who had priced the 2010 policy) offered AMSC three renewal options for 2011-12: (a) the same terms ($250,000 self-insured retention, $185,000 annual premium) as before; (b) a higher retention ($500,000) and a lower premium ($158,000); or (c) a$l million retention and a premium of $125,000. Had he known of the letter from Ghodawat, he would have requested copies of this and the licensing agreement and further information concerning the parties’ business relationship. He would still have written a $10 million professional liability policy, but not on the same terms as before: at a minimum, he would have charged the same $185,000 premium for a policy with the increased $500,000 self-retention.[3]
In the event, AMSC selected option (b), and Catlin issued a new policy for the period April 1, 2010 to April 1, 2011. Like the 2010 policy, this 2011 policy was delivered by e-mailing it to Marsh in New York, who then forwarded it to AMSC in Devens. The coverage was $10 million as before; the deductible was increased to $500,000 per claim; the premium was decreased to $158,000; the same notices and provisions appeared concerning the “claims made and reported” nature of the policy as in the 2010 policy; and there was the same choice-of-law clause as before.
On May 12, 2011, Ghodawat commenced an arbitration proceeding against Windtec in the ICC International Court of Arbitration in Singapore. Its claim was for 17.7 million euros, and was premised on the same allegations as it had made in the December 2010 letter.
AMSC evidently reported this development to Marsh USA, its insurance broker. On May 26, 2011, by letter from Marsh’s Rochester, New York office to Catlin’s Claims Department in Atlanta attaching Ghodawat’s Request for Arbitration, AMSC tendered the claim to Catlin and requested coverage and a defense. By letter to Tocci dated June 9, 2011 and referencing a conversation on June 7, Catlin informed AMSC that it was still investigating the claim, but had determined that it would not exercise its right under the policy to control the defense,[4] and so advised AMSC to retain counsel. Windtec retained the firm of Latham & Watkins to defend it.
On October 24, 2011 Catlin sent AMSC a formal reservation of rights. The following month, AMSC notified Catlin that its defense costs had exceeded the $500,000 deductible, and Catlin began paying or reimbursing those costs. At the time of filing of Catlin’s motion, it had expended $1,646,768.54 in legal fees and expenses for the defense of the arbitration.
*96 DISCUSSION
A. Coverage: The Usual Rule
Both the 2010 and the 2011 policy were clear that they covered “Professional Clatm[s] first made against the Insured during the Policy Period and reported to the Insurer during the Policy Period, Automatic Extended Reporting Period or the Optional Extended Reporting Period if applicable.” It is undisputed that Ghodawat first made claim against AMSC during the 2010 policy period, and that AMSC did not report the claim to Catlin until May 26, 2011, nearly two months after the 2010 policy period had ended, by which time Catlin had quoted, priced and issued a new claims made and reported policy knowing nothing of the Ghodawat claim. In short: the Ghodawat claim was not made and reported in the same policy period. By the plain language of both policies, therefore, it is not a covered claim.
The SJC has given the following explanation of the differing notice requirements as between occurrence policies and claims made and reported policies, why they are different, and the potentially differing consequences of late notice:[5]
There are, in general, two types of notice requirements found in policies. One is a requirement that notice of the claim be given to the insurer “as soon as practicable” after the event which gives rise to coverage. This type of notice requirement is almost always found in occurrence policies and frequently is found in claims-made policies. The other type of notice provision requires reporting of the claim during the term of the policy or within a short period of time (thirty or sixty days) following the expiration of the policy. This type of notice is always found in claims-made policies and is never found in occurrence policies.
The purposes of the two types of reporting requirements differ sharply. The purpose of a notice requirement, “as soon as practicable,” is to permit an insurer to make an investigation of the facts and occurrence relating to liability. However, fairness in rate setting is the purpose of a requirement that notice of a claim be given within the policy period or shortly thereafter, as we explain below.
An insurer has a difficult time setting rates in these inflationary, and otherwise rapidly changing, times, especially in connection with occurrence policies. The insurer may not be in a position to make good on its promise to indemnify the insured until many years after the insured event, that is, the occurrence, has happened . . .
The closer in time that the insured event and the insurer’s payoff are, the more predictable the amount of the payment will be, and the more likely it is that rates will fairly reflect the risks taken by the insurer. The purpose of a claims-made policy is to minimize the time between the insured event and the payment. For that reason, the insured event is the claim being made against the insured during the policy period and the claim being reported to the insurer within that same period or a slightly extended, and specified, period. If a claim is made against an insured, but the insurer does not know about it until years later, the primary purpose of insuring claims rather than occurrences is frustrated. Accordingly, the requirement that notice of the claim be given in the policy period or shortly thereafter in the claims-made policy is of the essence in determining whether coverage exists. Prejudice for an untimely report in this instance is not an appropriate inquiry.
Chas. T. Main, Inc. v. Fireman’s Fund Ins. Co., 406 Mass. 862, 864-65 (1990) (citation omitted).
That the notice requirements in a claims made and reported policy is to be strictly enforced, without exception for lack of prejudice, is the general consensus of courts here and elsewhere including, at least until recently (and perhaps still, see infra), in New York.[6] Under the common law of Massachusetts, therefore, AMSC’s failure to notify Catlin of the claim during the policy period in which it was received is fatal to its claims for indemnity and defense.
B. New York Insurance Law, Section 3420(a)(5)
AMSC, however, contends that Catlin, under a New York statute, must prove prejudice from AMSC’s tardy report if it is to defeat the claim for coverage. By Chapter 388 of the Laws of 2008, the New York Legislature amended section 3420 of the Insurance Law to provide, in pertinent part, as follows:
(a) No policy or contract insuring against liability for injuiy to person... or against liability for injury to, or destruction of, property shall be issued or delivered in this state, unless it contains in substance the following provisions . . . :
****
(5) A provision that failure to give any notice required to be given by such policy within the time prescribed therein shall not invalidate any claim made by the insured . . . unless the failure to provide timely notice has prejudiced the insurer... With respect to a claims-made policy, however, the policy may provide that the claim shall be made during the policy period, any renewal thereof, or any extended reporting period ... As used in this paragraph, the terms “claims-made policy” and “extended reporting period” shall have their respective meanings as provided in a regulation promulgated by the superintendent.
Because the policy was emailed to a Marsh agent in New York City, AMSC reasons, section 3420(a)(5) applies, and Catlin may not deny coverage except upon a showing of prejudice.
To this, Catlin responds (1) that the policy was neither issued nor delivered in New York State, so section 3420(a) would not apply; (2) that subsection 5 *97 does not apply to claims-made-and-reported policies; and (3) that AMSC’s misrepresentation on the 2011 policy application that there were no claims against it permits Catlin to void the 2011 policy ab initio, such that there was no period of renewal of the 2010 policy within which AMSC could notify Catlin of the claim in compliance with section 3420(a)(5). Because I agree that the policy was not “issued” or “delivered” in New York, it is unnecessary to reach Catlin’s second and third arguments.
Delivery of the policy is often the last act required to complete the insurance contract and activate coverage. It is thus an act of considerable significance both in contract law and, in the older cases applying the rule of lex loci contractus,[7] in conflicts of laws. See, e.g., Klefbeck v. Dous, 302 Mass. 383, 384 (1939) (“[t]he rights of [the insured] against the [insurer] are fixed by the contract of insurance which must be construed in accordance with the law of the place where it was executed and delivered”); United States Mtge. & Trust Co. v. Ruggles, 258 N.Y. 32, 38 (1932) (“[t]he place of contracting was where the policies were delivered to assured,” and the laws of that state “govern the rights created by the policies”).
As discussed below, the lex loci approach has largely been supplanted where conflict of laws is concerned; yet the statute in question still refers to “deliveiy” in New York. The question here, then, is: what sort of “delivery” triggers the protections of section 3420(a)(5)?
The statute does not define “delivered.” A venerable line of New York authorities has held, as a matter of contract law, that where the question is whether or not a policy was “delivered” such that coverage took effect, “deliveiy” may be accomplished by transmittal (a) in hand, by mail, or by email, (b) to an agent or broker for the insured, or even to the insurer’s agent with instructions to forward it to the insured. See, e.g., Jones v. Metropolitan Life Ins. Co., 158 Misc. 466, 286 N.Y.S. 4 (App.Term 1936) (insurer’s agent); Fidelity & Deposit Co. of Md. v. J.G. McGrory Co., 177 A.D. 493, 497, 164 N.Y.S. 561 (1st Dept. 1917) (insured’s broker); Morriss v. Home Ins. Co., 78 Misc. 303, 139 N.Y.S. 674 (City Ct. 1912) (broker). This approach still prevails in New York contract law, and has even been updated for today’s digital world. See B&A Demolition & Removal, Inc. v. Markel Ins. Co., 941 F.Sup.2d 307, 313-18 (E.D.N.Y. 2013) (email delivery to broker).
Such a generous concept of “delivery” is perfectly sensible in this context, since the insurer’s transmittal of the policy to the insured denotes the insurer’s acceptance of the application and its commitment to insure, and so is typically the last act in the formation of the contract of insurance. As a matter of contract law, then, the broad construction of the term “delivery” is unimpeachable: it gives the insured the benefit of its bargain, holds the insurer to its promise, and provides certainty for both sides as to when there is a contract.
“If a statute uses a word which has a definite and well-known meaning at common law, it will be construed with the aid of common-law definitions, unless it clearly appears that it was not so intended.” People v. King, 61 N.Y.2d 550, 554-55, 463 N.E.2d 601 (1984) (emphasis supplied). The qualifier is especially significant in this case. Although unambiguous terms in a statute are to be given their plain meaning,
[t]his is not to say... that the language of a statute must in all circumstances be literally or mechanically applied when, due to significantly changed circumstances, such application would cause an anachronistic or absurd result contrary to the contextual purpose of the enactment.
Doctors Council v. New York City Employees’ Retirement Sys., 71 N.Y.2d 669, 675, 529 N.Y.S.2d 732, 525 N.E.2d 454 (1988).
Section 3420(a)(5) does not explicitly invoke the contract law — as opposed to plain English — meaning of the term “delivered.” There is reason to doubt that its drafters intended that its substantive provisions should apply to a policy issued in Georgia to a Massachusetts insured, merely because it passed through the New York City office of the Massachusetts company’s insurance broker on the way.[8] Lex loci contractus has been largely or wholly abandoned as a rule of decision in the separate discipline of conflict of laws, because of its tendency, well illustrated by this case, to “produce awkward or arbitrary results where that place had no or little other connection with the contract or the parties.” Choate, Hall & Stewart v. SCA Servs., Inc., 378 Mass. 535, 541 (1979).
Rather than resort to the common law of contract, “it seems more reasonable to conclude that the primary purpose of the enactment was to protect residents of the state[,] . . . that the tests of delivery or issuance for delivery in the state were adopted as a practical means of achieving such protection,” and that they should be construed and applied so as to further the statutory purpose. Zogg v. Penn Mut. Life Ins. Co., 276 F.2d 861, 865 (2d Cir. I960);[9] accord, People by Abrams v. British & Amer. Cas. Co., 133 Misc.2d 352, 359, 505 N.Y.S.2d 759 (Sup. 1986) (“[c]ases establishing the technical meaning of ‘delivery’ for contract purposes are not controlling in the context of state regulation of foreign insurance companies,” citing Zogg).[10]
As with the statutes considered in the Zogg and British & American Casualty cases, the apparent intent of the 2008 amendment to section 3420(a) was to extend certain protections, theretofore lacking in New York law,[11] to New York insureds. The triggering language — "policy or contract. . . issued or delivered in this state" — is to be construed accordingly, rather than by mechanistic definitions developed long ago for *98 a wholly different purpose. The 2010 and 2011 policies were plainly not issued in New York; nor, under any reasonable construction of the term conceived with the statutory purpose in mind, were they “delivered” there. New York Insurance Law section 3420(a)(5) therefore does not apply in this case.
C. Choice of Law: Default Principles
AMSC maintains, however, that the parties effectively agreed that the prejudice requirement of section 3420(a)(5) would apply by virtue of the choice of law clause in each policy. Absent such a clause, Massachusetts employs “a functional choice-of-law approach that responds to the interests of the parties, the States involved, and the interstate system as a whole,” and which looks to the Restatement (Second) of Conflict of Laws (1971) for guidance as to the particulars. Bushkin Assocs., Inc. v. Raytheon Co., 393 Mass. 622, 631, 632 (1985).
Under section 193 of the Restatement, the validity of a liability policy and the rights created by it
are determined by the local law of the state which the parties understood was to be the principal location of the insured risk during the term of the policy, unless with respect to the particular issue, some other state has a more significant relationship ... to the transaction and the parties, in which event the local law of the other state will be applied.
Comment b (para, second) explains:
In the nature of things, the policy will usually be solicited in the state of the insured’s domicil and usually the insured risk will also be located there. In the normal case, therefore, the policy will have been solicited and delivered and the last act necessary to make the contract binding will have taken place in the state where the insured is domiciled or incorporated, and where the insured risk is located. This state, in such a situation, will usually be the state of the applicable law, at least with respect to most issues.
Particularly in the age of national and global enterprise, however, an insured risk may be scattered among multiple states and countries (as, for example, where an Indian company demands arbitration in a Singapore international court of its dispute over an Indian project licensed under an agreement covering India, Bangladesh, Sri Lanka and South Africa, granted to it by the Austrian subsidiary of a company located in Devens, Massachusetts).
The location of the insured risk will be given greater weight than any other single contact in determining the state of the applicable law provided the risk can be located, at least principally, in a single state. Situations where this cannot be done, and where the risk has less significance, include . .. where the policy covers a group of risks that are scattered throughout two or more states.
Restatement §193, Comment b, para, third (emphasis supplied).
The “particular issue” in this case concerns the insured’s obligation to notify the insurer of a claim and the consequence of its failure to do so as the policy required. The 2010 and 2011 policies were solicited by AMSC from its Devens headquarters. Windtec referred the claim in question to Devens for action, and senior management (including AMSC’s CFO and general counsel) analyzed the claim, prepared a “Loss Contingency Memo” concerning it, decided on a $500,000 reserve, wrote to Ghodawat denying its allegations and proposing a settlement meeting, met with a Ghodawat representative, completed and reviewed the application for the 2011 policy on which the Ghodawat claim (or the likelihood of such a claim) was not disclosed, and emailed it to Marsh USA’s Boston office for transmittal to Catlin. All of this took place in Massachusetts, as did AMSC’s deliberations over what to do with the Ghodawat claim and, apparently, management’s decision to say nothing about it while the new policy application was pending.
Plainly, Massachusetts bears the most significant relationship to the issue in this case, and under the forum’s conflict of law principles, Massachusetts law would ordinarily apply. See W.R. Grace Co. v. Hartford Acc. & Indem. Co., 407 Mass. 572, 585-86 (1990) (under Massachusetts choice of law rules, New York law would govern coverage issues concerning nationwide asbestos claims, where most of the policies were negotiated, and insured had multistate operations but was incorporated and domiciled, in New York; “[s]uch a result produces coherent interstate insurance coverage; appears to conform to justified expectations; offers the prospect of certainty, predictability, and uniformity of result; provides relative ease in the determination and application of the governing law; and looks to the law of the State which, as to the legal issues involved, has the most significant relationship •with the transaction and the parties”); General Elec. Co. v. Lines, 2008 WL 2908053 (Mass.Super. 2008; Gants, J.) at *5-*8 [24 Mass. L. Rptr. 319] (applying law of insured’s domicile to coverage issues, including late notice issues, arising out of “more than a hundred different environmental claims . . . nationwide in scope”).
D. Choice of Law Clause
“Where parties have specifically expressed an intent as to the governing law,” however, a Massachusetts court will “respect that intent unless the result would be contrary to our public policy.” Feeney v. Dell Inc., 454 Mass. 192, 206 (2009). Both of the Catlin policies had identical choice of law provisions.
Such clauses come in varying widths. The clause in the 2010 and 2011 policies, providing in each case that the “policy shall be subject [to] interpretation under the law of the State of New York,” is unquestionably at the narrow end of the spectrum. Cf. Jacobson *99 v. Mailboxes Etc. U.S.A., Inc., 419 Mass. 572, 580 n.9 (1995) (“[t]he agreement does not state that the rights of the parties are to be governed by California law but only that the agreement is to be governed and construed by California law”; therefore, Massachusetts law governed application of Chapter 93A).
Jacobsonis in line with other decisions holding that a clause providing that the contract is to be “governed” or “construed” by a particular state’s law does not dictate the choice of law applicable to non-contract (e.g., tort or statutory) claims between the contracting parties, or to questions regarding the contract’s validity and enforceability. E.g., Computer Sales Int’l, Inc. v. Lycos, Inc., 2005 WL 3307507, *2 (D.Mass. Dec. 6, 2005) (applicability of c. 93A); Pegasus Aviation IV, Inc. v. Aerolineas Austral Chile, S.A., 2012 WL 967301, *5 (S.D.N.Y. Mar. 20, 2012) (authority of supposed agent executing contract on defendant’s behalf); and contrast Northeast Data Sys., Inc. v. McDonnell Douglas Computer Sys. Co., 986 F.2d 607, 609-11 (1st Cir. 1992) (California law applied to c. 93A claims where contract provided broadly that parties’ “rights and obligations” under contract were to be “governed and construed” under California law).
“New York law,” like our own, “gives full effect to choice of law provisions, but looks to the language of the provision to determine the scope of its application.” Stagecoach Transp., Inc. v. Shuttle, Inc., 50 Mass.App.Ct. 812, 818 (2001). In this case, the disputed issue is not one of interpretation — the policy language could hardly have been clearer that the policy “applie[d] only to claims which are both first made and reported to the insurer during the policy period . . .” — but one of validity. New York Insurance Law section 3420(a)(5) does not prescribe a rule of construction; rather, it prohibits the issuance or delivery of certain liability insurance policies within the State of New York. That the judicial remedy for a violation might be in the nature of reformation of an unenforceable policy term does not transform an issue of validity into one of interpretation.
One may doubt, moreover, that even a broad-form choice of law provision could be construed to incorporate section 3420(a)(5) into an insurance contract to which the statute expressly did not apply. This very question was considered in Indian Harbor Ins. Co. v. City of San Diego, 2013 WL 5430380 (U.S. District Court, S.D.N.Y. Sept. 25, 2013). There, an insurance policy provided that “[a]ll matters arising hereunder including questions relating to the validity!,] interpretation, performance and enforcement of this Policy shall be determined in accordance with the law and practice of New York.” The court held that this language did not import the prejudice requirement of section 3420(a)(5), where the policy had neither been issued nor delivered in New York' and did not appear to alter the common law of New York for policies not subject to it. Id. at *3, *12.
E. Conclusion
Because the policies in question were neither issued nor delivered in the State of New York, N.Y. Ins. Law §3420(a)(5) does not apply. Because the dispute in this case hinges not on the policy’s interpretation, but on the validity of the requirement that the claim be made and reported during the same policy period— in other words, on the very legality of a claims-made- and-reported policy[12] — the policies’ choice-of-law provision does not apply to the issue of whether the insurer must show prejudice from a late report; rather, Massachusetts law governs.
Under the plain terms of the policy, claims were required to be made and reported in the same policy period. Under Massachusetts law, such a provision is enforceable and the insurer need not prove prejudice from a late notification. It follows that Catlin had and has no obligation to defend or indemnify AMSC against the Ghodawat claim.
ORDER FOR PARTIAL JUDGMENT
For the foregoing reasons,
1. Catlin Specialty Insurance Company’s Motion for Partial Summary Judgment (Paper # 18) is ALLOWED;
2. Defendants’ Motion for Summary Judgment on Reporting Requirement (Paper #15) is DENIED; and
3. Defendants’ Motion for Summary Judgment on Plaintiffs Rescission Claim (Paper #16) is DENIED as moot.
On Count II of the Complaint, judgment shall enter for the plaintiff, Catlin Specialty Insurance Company, declaring that Catlin owes no duty to defend or indemnify AMSC Windtec GmbH (“Windtec”) in connection with the ICC arbitration commenced by Ghodawat Energy Pvt. Ltd (“Ghodawat”) under Catlin Policy CPL-99976-410 (the “2010 Policy”) or CPL-99976-0412, due to Windtec’s failure to timely report Ghodawat’s claim during the period of the 2010 Policy.
Count I is hereby dismissed as moot.
Counsel will please contact the session clerk to suggest a date and time for a status conference in Courtroom 640 in Woburn, at which counsel for both sides shall be prepared to discuss all outstanding issues and a schedule for final disposition.

The notice on the first page of the policy differed slightly in that it inserted the words, “BY OR AGAINST THE INSURED” after the second instance of the word “MADE.”

The policy provided for both automatic and optional extended reporting periods upon termination or non-renewal of the policy for reasons other than non-payment of premium, the insured’s failure to comply with any term or condition, or fraud or material misrepresentation. The Automatic Extended Reporting Period runs for 60 days after termination, and the insured could purchase a longer Optional Extended Reporting Period of up to 36 months after termination by paying an additional premium. Because the 2010 policy — during whose period the claim was first made — was renewed and not terminated, neither extended reporting period is applicable to this case.

Allowing that hindsight is always 20/20, I do not agree with AMSC’s characterization of Nurullah’s affidavit testimony on this point as “incompetent speculation.” Mr. Narullah gave a somewhat more particularized account of the underwriting process in his deposition testimony than in his affidavit. It is, as one would expect, methodical and experience-based, and his affidavit testimony that knowledge of a serious open claim from one policy year would affect the pricing of the next year’s policy is both unrebutted and entirely plausible.

The policy provided that in the event of a covered claim adjudicated in a forum outside the United States and Canada, Catlin “shall have the right, but not the duly” to control the defense, but would indemnify the insured for any “Claim Expense” and any loss incurred.

As is often the case injudicial decisions, the SJC in the Chas. T. Main decision referred to the policy in question as a “claims made” policy. It is apparent, however, from both the quoted policy language and the court’s discussion of it, that the policy was a claims made and reported policy: i.e., that the claim made to the insured and the report to the insurer had to occur in the same policy period to be covered.

See Gargano v. Liberty Int’l Underwriters, Inc., 572 F.3d 45, 49 (1st Cir. 2009) (“It is clear under Massachusetts law that for a ‘claims made and reported’ policy, ‘the insured event’ is the combination of both requirements: (1) the claim must be first made against the insured during the policy period, and (2) the claim must be reported to the insurer within the policy period”); National Union Fire Ins. Co. v. Talcott, 931 F.2d 166, 168 (1st Cir. 1991) (similar); Checkrite Ltd., Inc. v. Illinois Nat. Ins. Co., 95 F.Sup.2d 180, 185, 191-94 (S.D.N.Y. 2000) (New York law; “The nature of a claims-made policy is that it protects the insured for claims made against it and reported to the insurer within the policy period or, if applicable, the extended reporting period. Thus, ‘[a]n insured under a ’’claims made" policy knows in advance that there is an applicable date that cuts off claims’ “ (citations omitted)); Camalloy Wire, Inc. v. Nat’l Union Fire Ins. Co. of Pittsburgh, Pa., 273 A.D. 123, 709 N.Y.S.2d 553, 554 (N.Y.App. 2000); Rochwarger v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa., 192 A.D.2d 305, 595 N.Y.S.2d 459, 459 (N.Y.App. 1993) (‘The distinction between ‘claims made’ and ‘occurrence’ policies controls the issue of coverage in this case, not whether defendant-insurer suffered any prejudice as a result of the short delay in giving notice of the claim”); Hasbrouck v. St. Paul Fire and Marine Ins. Co., 511 N.W.2d 364, 366-69 (Iowa 1993), and cases cited; Zuckerman v. Nat’l Union Fire Ins. Co., 100 N.J. 304, 495 A.2d 395, 406 (N.J. 1985) (requiring a showing of prejudice from late reporting under a claims made policy “would significantly affect both the actuarial basis upon which premiums have been calculated and, consequently, the cost of ’claims made’ insurance. So material a modification in the terms of this form of insurance widely used to provide professional liability coverage both in this State and throughout the country would be inequitable and unjustified.’’).

The lex loci contractus rule has largely been supplanted, where insurance is concerned, by a preference for “the local law of the state which the parties understood was to be the principal location of the insured risk during the term of the policy.” Restatement (Second) of Conflict of Laws, §193 (197); see Bushkin Assocs., Inc. v. Raytheon Co., 393 Mass. 622, 630-31 (1985) (“[ajlmost all States have abandoned the lex loci rule”); Clarendon Nat. Ins. Co. v. Arbella Mut. Ins. Co., 60 Mass.App.Ct. 492, 496-500 (2004); Hartford Nat. Bank and Trust Co. v. United Truick Leasing Corp., 24 Mass.App.Ct. 626, 630 n.6 (1987). See discussion in text below.

It will be recalled that AMSC sought an insurance program through Marsh USA’s Boston office; it was Marsh that assigned the project to brokers in New York. According to Marsh USA’s website, it has offices in Boston, New York, and 79 other American cities, from Southwest Harbor to San Diego (and Honolulu).

In Zogg, the court considered N.Y. Insurance Law §155, which by its terms was applicable to any “policy of life insurance delivered or issued for delivery in this state,” and provided that a policy restriction in the event of suicide was “void where the insured commits suicide while insane.” The insured was a New York resident, but applied for the policy and paid the first premium while in Massachusetts. A jury found, on conflicting evidence, that the policy was mailed to the insured at his New York address, but the insurer contended that because the contract had been formed in Massachusetts (where the insured had received the “binding receipt” and paid the first premium), the law of Massachusetts — the lex loci contractus — applied. The Court of Appeals held otherwise, noting that “the special and substantial interest of the state in affording protection to its residents in the insurance field is widely recognized.” 276 F.2d at 265.

Thus, the court held, a Tortolla (B.V.I.) mail-order insurer was subject to the anti-fraud protections of the New York Insurance Law, notwithstanding an exception for policies “principally negotiated, issued and delivered without this state” (N.Y. Ins. Law §1101 (b)(2)(E)) and “black letter contract law” under which “a policy or contract for insurance is ‘delivered’ at the place where it is mailed.” 133 Misc.2d at 358-59.
Zogg and British & American Casualty are in line with cases from other jurisdictions holding that choice of law is not dictated by the place of delivery to the insured’s agent or broker, where the broker is not located in the same state as the insured to which the policy is forwarded. See Evangelical Lutheran Church in America v. Atlantic Mut. Ins. Co., 169 F.3d 947, 950 (5th Cir. 1999) (applying Illinois law as to choice of law); Dublin Eye Assocs., P.C. v. Massachusetts Mut. Life Ins. Co., 2013 WL 3725039 at *12-*13 (E.D.Ky. July 12, 2013) (Kentucky law); Admiral Ins. Co. v. G4S Youth Servs., Inc., 634 F.Sup.2d 605, 611-12 (E.D.Va. 2009) (Virginialaw); Emerson Elec. Co. v. Aetna Cas. & Sur. Co., 319 Ill.App.3d 218, 743 N.E.2d 629, 640-43 (2001) (Illinois law).

The New York State Senator who proposed the amendment wrote, “New York is in the minority of states in the country because most states require insurers to suffer some sort of prejudice before coverage may properly be denied for late notice.” Senate Bill No. S8610, Issuer’s Memorandum in Support, p. 3. This was a correct statement as to most policies, but not claims made and reported liability policies.

Interestingfy, the Superintendent of the New York Insurance Department was, in 2003, called upon to opine whether an insurer may issue a liability insurance policy in New York that limits coverage to incidents for which the claims are made and reported during the policy term (“claims made and reported” policies). His answer was that because of the regulatory provision that under a claims-made policy, “[a] claim will be deemed first made when the insurer receives written notice of a claim or suit from the insured or a third party” (N.Y.Comp. Codes & Regs., tit. 11, §73.3(a)), “[a] claims-made- and-reported policy may not be issued in New York except by an unauthorized insurer through an excess lines broker.” N.Y. Ins. Dept. OGC Opinion 2003-228. Catfin points to this as support for its argument that Ins. Law §3420(a)(5), as amended five years after the CGO Opinion, was not intended to apply to claims-made-and-reported policies.
Unlike the just-quoted regulatory definition of “claim,” the insertion of a prejudice requirement for late notice would not define the claims-made-and-reported policy out of existence, but it would fundamentally alter the assumptions on which they are priced. Having found that for other reasons this section does not apply to these policies in question here, I have not reached this issue.